# BARNHART, COMMISSIONER OF SOCIAL SECURITY
## *v.* SIGMON COAL CO., INC., ET AL.

No. 00–1307.   Argued November 7, 2001—Decided February 19, 2002

440

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, SOUTER, and GINSBURG, JJ., joined. STEVENS, J., filed a dissenting opinion, in which O'CONNOR and BREYER, JJ., joined, *post*, p. 462.

*Paul R. Q. Wolfson* argued the cause for petitioner. With him on the briefs were *Solicitor General Olson, Acting As-*

sistant Attorney General Schiffer, Deputy Solicitor General Kneedler, Mark B. Stern, and Jeffrey Clair.

Peter Buscemi argued the cause for the Trustees of the United Mine Workers of America Combined Benefit Fund as amici curiae urging reversal. With him on the brief were John R. Mooney, Mark J. Murphy, and David W. Allen.

John R. Woodrum argued the cause for respondents. With him on the briefs was Harold R. Montgomery.*

JUSTICE THOMAS delivered the opinion of the Court.

This case arises out of the Commissioner of Social Security's assignment, pursuant to the Coal Industry Retiree Health Benefit Act of 1992 (Coal Act or Act), 26 U. S. C. § 9701 et seq. (1994 ed. and Supp. V), of 86 retired coal miners to the Jericol Mining, Inc. (Jericol). The question presented is whether the Coal Act permits the Commissioner to assign retired miners to the successors in interest of out-of-business signatory operators.[1] The United States Court of Appeals for the Fourth Circuit held that it does not. Sigmon Coal Co. v. Apfel, 226 F. 3d 291 (2000). We affirm.

## I

The Coal Act reconfigured the system for providing private health care benefits to retirees in the coal industry. In restructuring this system, Congress had to contend with

---

*Grant Crandall filed a brief for the United Mine Workers of America as amicus curiae urging reversal.

Briefs of amici curiae urging affirmance were filed for the Bellaire Corp. by Donald B. Ayer, Jonathan C. Rose, and Thomas A. Smock; for R. G. Johnson Co., Inc., by Mary Lou Smith; and for USX Corp. et al. by David J. Laurent.

[1] A signatory operator is a "coal operato[r] that signed any [National Bituminous Coal Wage Agreement] or any other agreement requiring contributions to the 1950 or 1974 Benefit Plans." Eastern Enterprises v. Apfel, 524 U. S. 498, 514 (1998); see also 26 U. S. C. § 9701(c)(1) (1994 ed.) ("The term 'signatory operator' means a person which is or was a signatory to a coal wage agreement").

over half a century of collective-bargaining agreements between the coal industry and the United Mine Workers of America (UMWA), the coal miners' union. Tensions between coal operators and the UMWA had often led to lengthy strikes with serious economic consequences for both the industry and its employees. Confronted with an industry fraught with contention, Congress was faced with a difficult task.[2]

This was not the first time that the Federal Government had been called on to intervene in negotiations within the industry. Such tensions motivated President Truman, in 1946, to issue an Executive Order directing the Secretary of the Interior to take possession of all bituminous coal mines and to negotiate with the UMWA over changes in the terms and conditions of miners' employment. See *Eastern Enterprises* v. *Apfel*, 524 U. S. 498, 504–505 (1998) (plurality opinion) (quoting 11 Fed. Reg. 5593 (1946)). These negotiations culminated in the first of many agreements that resulted in the creation of benefit funds compensating miners, their dependents, and their survivors. 524 U. S., at 505.

Subsequently, in 1947, the UMWA and several coal operators entered into a collectively bargained agreement, the National Bituminous Coal Wage Agreement (NBCWA), which established a fund under which three trustees "were given authority to determine," among other things, the allocation of benefits to miners and their families. *Id.*, at 505–506. Further disagreement prompted the parties to negotiate another NBCWA in 1950. The following year, the Bituminous Coal Operators' Association (BCOA) was created as a multiemployer bargaining association and primary representative for the coal operators in their negotiations with the UMWA. *Id.*, at 506.

---

[2] In *Eastern Enterprises*, 524 U. S., at 504–514, we discussed at great length the history of negotiations between the coal industry and the UMWA over the provision of employee benefits to coal miners. We provide only a brief summary here.

While the NBCWA was amended occasionally and new NBCWAs were adopted in 1968 and 1971, the terms and structure of the 1950 agreement remained largely unchanged between 1950 and 1974. *Ibid.* In 1974, in order to comply with the Employee Retirement Income Security Act of 1974, 29 U. S. C. § 1001 *et seq.* (1994 ed. and Supp. V), the UMWA and the BCOA negotiated a new agreement to finance benefits. 524 U. S., at 509. The 1974 NBCWA created four trusts that replaced the 1950 fund.[3]

These benefit plans quickly developed financial problems. Thus, in 1978 the parties executed another NBCWA. This agreement assigned responsibility for the health care of active and retired employees to the respective coal mine operators who were signatories to the earlier NBCWAs, and left the 1974 Benefit Plan in effect only for those retirees whose former employers were no longer in business. *Id.,* at 510.

Nonetheless, financial problems continued to plague the plans "as costs increased and employers who had signed the 1978 NBCWA withdrew from the agreement, either to continue in business with nonunion employees or to exit the coal business altogether." *Id.,* at 511. "As more and more coal operators abandoned the Benefit Plans, the remaining signatories were forced to absorb the increasing cost of covering retirees left behind by exiting employers." *Ibid.* Pursuant to yet another NBCWA, the UMWA and the BCOA in 1988 attempted to remedy the problem, this time by imposing withdrawal liability on NBCWA signatories that seceded from the benefit plans.

Despite these efforts, the plans remained in serious financial crisis and, by June 1991, the 120,000 individuals who

---

[3] These trusts included the UMWA 1950 Benefit Plan and Trust (1950 Benefit Plan), which provided nonpension benefits including medical benefits for miners who retired before January 1, 1976, and the UMWA 1974 Benefit Plan and Trust (1974 Benefit Plan), which provided such benefits for active miners and those who retired after 1975. *Id.,* at 509.

received health benefits from the funds were in danger of losing their benefits. Frieden, Congress Ponders Fate of Coal Miners' Fund, 10 Business & Health 65 (Sept. 1992) (hereinafter Frieden). About 60% of these individuals were retired miners and their dependents whose former employers were no longer contributing to the benefit plans. Another 15% worked for employers that were no longer UMWA-represented or were never unionized.[4] Karr, Union, Nonunion Coal Companies Head for Showdown on Retirement Benefits, Wall Street Journal, Mar. 3, 1992, p. A6 (hereinafter Karr). These troubles were further aggravated by rising health care costs. Frieden 65.

The UMWA threatened to strike if a legislative solution was not reached. Karr A6. And BCOA members, which included those coal firms that were currently signatories to NBCWAs, threatened that they would not renew their commitments to cover retiree costs when their contracts expired. *Ibid.* Following another strike and much unrest, Secretary of Labor Elizabeth Dole created the Advisory Commission on United Mine Workers of America Retiree Health Benefits (Coal Commission), which studied the problem and proposed several solutions. *Eastern Enterprises,* 524 U. S., at 511–512. In particular, the Coal Commission focused on how to finance the health care benefits of orphaned retirees.

Congress considered these and other proposals and eventually reconfigured the allocation of health benefits for coal miner retirees by enacting the Coal Act in 1992. Crafting the legislative solution to the crisis, however, was no easy task. The Coal Act was passed amidst a maelstrom of con-

---

[4] The term "orphan retirees" encompassed both "true orphans," whose former employers were no longer in business, and "reachback orphans," whose former employers were still in business but no longer signatories to a coal wage agreement and possibly no longer in the coal business. House Committee on Ways and Means, Development and Implementation of the Coal Industry Retiree Health Benefit Act of 1992, 104th Cong., 1st Sess., 1 (Comm. Print 1995) (hereinafter Development).

tract negotiations, litigation,[5] strike threats, a Presidential veto of the first version of the bill[6] and threats of a second veto, and high pressure lobbying,[7] not to mention wide disagreements among Members of Congress.

---

[5] See, e. g., *McGlothlin v. Connors*, 142 F. R. D. 626 (WD Va. 1992). This lawsuit involved the beneficiaries of the 1950 Benefit Plan and the 1974 Benefit Plan, the trustees, and the BCOA. The District Court Judge encouraged them to "zealously seek passage of a bill in Congress to permit the transfer of other funds now in the possession of the Trustees, which are in excess of any future projected needs, to finance the Benefit Trusts." *Id.*, at 646.

[6] Under the original proposal, introduced by Senator Jay Rockefeller, benefits would have been financed through taxes on the entire coal industry and premiums collected from reachback companies that were considered responsible for specific orphans. Development 12. With support from both the UMWA and the BCOA, but not the Private Benefits Alliance (PBA), a group of nonunion companies, Congress originally passed this bill as part of a comprehensive tax package. See Karr A6. President Bush, however, vetoed the entire package, in part because of the coal tax provisions. Tax Package Veto Kills Bailout Plan; Rockefeller Vows to Find Another Way, Mine Regulation Reporter, Mar. 27, 1992, 1992 WL 2219562. Members of Congress continued to push for legislation, using a comprehensive energy bill as the vehicle. While Senator Rockefeller attempted to add the coal tax provision to the energy bill, his measure was strongly opposed by a number of Senators and by the Bush administration. Cloture Motion on Energy Bill Fails but Dole Says Resolution of Dispute Over Controversial Coal Tax May Be Near; Bush Threatens Veto if it Remains, Foster Natural Gas Report, No. 1886, July 23, 1992, p. 1. After much negotiation, the final version of the bill did not include the tax provision and provided that only companies that were party to the NBCWAs would be required to cover retiree health costs. Senate Adopts Compromise Amendment on Funding of Miner Health Benefits, 147 BNA Daily Labor Report No. 147, p. A–12 (July 30, 1992).

[7] The UMWA and the BCOA, for example, had joined forces to support legislation that would require nonunion companies to share in the cost of providing the health benefits, thereby shifting the burden of paying into the funds to the entire industry. By contrast, the PBA, the alliance of nonunion companies, insisted that because they never employed any of the retirees, they should not be forced to pick up the other companies' obligations. Karr A6.

The Act "merged the 1950 and 1974 Benefit Plans into a new multiemployer plan called the United Mine Workers of America Combined Benefit Fund (Combined Fund)." *Id.*, at 514; see 26 U. S. C. § 9702(a) (1994 ed.). The Combined Fund "is financed by annual premiums assessed against 'signatory coal operators,' *i. e.*, coal operators that signed any NBCWA or any other agreement requiring contributions to the 1950 or 1974 Benefits Plans." *Eastern Enterprises*, 524 U. S., at 514. Where the signatory is no longer in business, the statute assigns liability for beneficiaries[8] to a defined group of "related persons." *Ibid.*; see §§ 9706(a), 9701(c)(2), (7). The Coal Act charged the Commissioner of Social Security with assigning each eligible beneficiary to a signatory operator or its related persons. § 9706(a). The statute identifies specific categories of signatory operators (and their related persons) and requires the Commissioner to assign beneficiaries among these categories in a particular order. *Ibid.* The Coal Act also ensures that if a beneficiary remains unassigned because no existing company falls within the aforementioned categories, then benefits will be financed by the Combined Fund, either with funds transferred from interest earned on the Department of the Interior's Abandoned Mine Reclamation Fund or from an additional premium imposed on all assigned signatory operators on a pro rata basis. See §§ 9704(a), (d), 9705(b).

## II

Respondent Jericol was formed in 1973 as Irdell Mining, Inc. (Irdell). Shortly thereafter, Irdell and another company purchased the coal mining operating assets of Shackleford Coal Company, a company that was a signatory to a coal

---

[8] The term "beneficiary" refers to an individual who "(1) is a coal industry retiree who, on July 20, 1992, was eligible to receive, and receiving, benefits from the 1950 UMWA Benefit Plan or the 1974 UMWA Benefit Plan, or (2) on such date was eligible to receive, and receiving, benefits in either such plan by reason of a relationship to such retiree." § 9703(f).

wage agreement while it was in business. *Sigmon Coal Co. v. Apfel,* 33 F. Supp. 2d 505, 507 (WD Va. 1998). They acquired the right to use the Shackleford name and assumed responsibility for Shackleford's outstanding contracts, including its collective-bargaining agreement with the UMWA. App. 23–24, 26. "There was no common ownership between Irdell and Shackleford." 226 F. 3d, at 297. Irdell subsequently changed its name, operating as the Shackleford Coal Company until 1977, when it again changed its name to Jericol. The new company was a signatory only to the 1974 NBCWA.

Acting pursuant to § 9706(a), between 1993 and 1997, the Commissioner assigned premium responsibility for over 100 retired miners and dependents to Jericol. Of these, 86 were assigned under § 9706(a)(3) because they had worked for Shackleford and the Commissioner determined that as a "successor" or "successor in interest" to the original Shackleford, Jericol qualified as a "related person" to Shackleford. The others were assigned because they had actually worked for Jericol. Jericol appealed most of the Commissioner's determinations,[9] arguing that the assignments were erroneous both because Jericol was not a successor in interest to Shackleford and because Jericol was not a related person to Shackleford.[10] See, *e. g.,* Pet. for Cert. 45a–62a.

Dissatisfied with the outcome of administrative proceedings, respondent Sigmon Coal Company, Inc.,[11] and Jericol

---

[9] Jericol did not appeal the most recent 1997 assignment to the Commissioner, arguing that it had already filed suit and should not be required to exhaust its administrative remedies before seeking relief given the similarity of the law and facts underlying each assignment of Shackleford's miners to Jericol. The District Court agreed. *Sigmon Coal Co. v. Apfel,* 33 F. Supp. 2d 505, 508 (WD Va. 1998).

[10] In this case, we are only reviewing whether Jericol is a related person to Shackleford.

[11] Sigmon Coal joined Jericol as a plaintiff apparently because they are related persons under the Coal Act, 26 U. S. C. § 9701(c)(2) (1994 ed.), and thus jointly and severally responsible for any amounts due from either. § 9704(a). See 33 F. Supp. 2d, at 506, n. 3.

filed suit against the Commissioner, arguing that he wrongfully assigned retirees and dependents to Jericol. 33 F. Supp. 2d, at 506. The District Court concluded that the classification regime of the Coal Act does not provide, directly or indirectly, "for liability to be laid at the door of successors of defunct signatory operators." *Id.*, at 509. The District Court ordered the Commissioner to withdraw the challenged assignments and enjoined the Commissioner from assigning additional retirees to Jericol on the basis that it is a related person to the original Shackleford.

The Commissioner appealed, arguing that a "straight reading" of the statute shows that a successor in interest to a signatory operator qualifies as a related person, thereby permitting the assignment of the retirees and dependents to Jericol. 226 F. 3d, at 303. Alternatively, the Commissioner argued that the District Court's "reading . . . produces inexplicable, anomalous results that are clearly at odds with congressional intent." *Ibid.*

"[D]eclin[ing] the Commissioner's invitation to rewrite the Coal Act," the United States Court of Appeals for the Fourth Circuit affirmed. *Id.*, at 294. The Court of Appeals concluded that the "statute is clear and unambiguous" and that the court was "bound to read it exactly as it is written." *Ibid.* Accordingly, the court held that Jericol was not a "related person" to Shackleford and thus could not be held responsible for Shackleford's miners. The Court of Appeals rejected the Commissioner's arguments that this reading either contravenes congressional intent or begets "some fairly odd results." *Id.*, at 305, 307. Rather, the Court of Appeals found plausible Jericol's explanation that the plain text of the Act was consistent with Congress' desire to promote the sale of coal companies and to respond to complaints by coal operators that they were being required to pay benefits for retired miners who had neither worked for them nor maintained any other relationship with them. *Id.*, at 307. A plausible explanation, the court concluded, "is all we need

to reject the assertion that the Coal Act's definition of 'related person' is, on its face, absurd." *Id.*, at 308. Alternatively, the court reasoned, even if the literal text of the statute produced an arguably anomalous result, "we are not simply free to ignore unambiguous language because we can imagine a preferable version." *Ibid.* This was not one of those rare cases, the court concluded, where Congress had drafted a statute that "produced an absurdity 'so gross as to shock the general moral or common sense.'" *Ibid.* (quoting *Maryland Dept. of Ed.* v. *Department of Veterans Affairs*, 98 F. 3d 165, 169 (CA4 1996)).

We granted certiorari, 532 U. S. 993 (2001), and now affirm.

## III

As in all statutory construction cases, we begin with the language of the statute. The first step "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 340 (1997) (citing *United States* v. *Ron Pair Enterprises, Inc.*, 489 U. S. 235, 240 (1989)). The inquiry ceases "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" 519 U. S., at 340.

With respect to the question presented in this case, this statute is unambiguous. The statutory text instructs that the Coal Act *does not permit* the Commissioner to assign beneficiaries to the successor in interest of a signatory operator. The statute provides:

"For purposes of this chapter, the Commissioner of Social Security shall, before October 1, 1993, assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with respect to which) remains in business in the following order:

"(1) First, to the signatory operator which—

"(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

"(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry for at least 2 years.

"(2) Second, if the retiree is not assigned under paragraph (1), to the signatory operator which—

"(A) was a signatory to the 1978 coal wage agreement or any subsequent coal wage agreement, and

"(B) was the most recent signatory operator to employ the coal industry retiree in the coal industry.

"(3) Third, if the retiree is not assigned under paragraph (1) or (2), to the signatory operator which employed the coal industry retiree in the coal industry for a longer period of time than any other signatory operator prior to the effective date of the 1978 coal wage agreement." 26 U. S. C. § 9706(a) (1994 ed.).

In this case, the Commissioner determined that because Shackleford is a pre-1978 signatory and employed the disputed miners for over 24 months, assignment must be made under category 3. It then assigned the miners to Jericol after determining that Jericol was a successor in interest to Shackleford and was therefore a "related person" to Shackleford. 226 F. 3d, at 298.

We disagree with the Commissioner's reasoning. Because the disputed retirees were employees of Shackleford, the "signatory operator" that sold its assets to Jericol (then-Irdell) in 1973, the Commissioner can only assign them to Jericol if it is a "related person" to Shackleford. The statute provides that "a person shall be considered to be a related person to a signatory operator if that person" falls within one of three categories:

"(i) a member of the controlled group of corporations (within the meaning of section 52(a)) which includes such signatory operator;

"(ii) a trade or business which is under common control (as determined under section 52(b)) with such signatory operator; or

"(iii) any other person who is identified as having a partnership interest or joint venture with a signatory operator in a business within the coal industry, but only if such business employed eligible beneficiaries, except that this clause shall not apply to a person whose only interest is as a limited partner." § 9701(c)(2).

In addition, the last sentence of § 9701(c)(2)(A) states that "[a] related person shall also include a successor in interest of any person described in clause (i), (ii), or (iii)."

Although the Commissioner maintains that Jericol is a "related person" to Shackleford, Jericol does not fall within any of the three specified categories defining a "related person." There is no contention that it was ever a member of a controlled group of corporations including Shackleford, that it was ever a business under common control with Shackleford, or that it ever had a partnership interest or engaged in a joint venture with Shackleford. Therefore, liability for these beneficiaries may attach to Jericol only if it is a successor in interest to an entity described in §§ 9701(c)(2)(A)(i)–(iii). Because Jericol is a successor in interest only to Shackleford, Jericol will be liable only if a signatory operator itself, here Shackleford, falls within one of these categories. None of the three categories, however, includes the signatory operator itself.

Nor should we infer as much, as it is a general principle of statutory construction that when "'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Russello* v. *United States,* 464 U. S. 16, 23 (1983) (quoting *United States* v. *Wong Kim Bo,* 472 F. 2d 720, 722 (CA5 1972)). Where Congress wanted to provide for successor liability in the Coal Act, it did so explic-

itly, as demonstrated by other sections in the Act that give the option of attaching liability to "successors" and "successors in interest."

For example, § 9706(b)(2) provides that with respect to beneficiaries of the Combined Fund, "[i]f a person becomes a successor of an assigned operator after the enactment date [of the Coal Act], the assigned operator *may* transfer the assignment of an eligible beneficiary . . . to such successor, and such successor shall be treated as the assigned operator with respect to such eligible beneficiary for purposes of this chapter." (Emphasis added.) The subsection also provides, however, that "the assigned operator transferring such assignment (and any related person) shall remain the guarantor of the benefits provided to the eligible beneficiary under this chapter." *Ibid.* While this provision gives a *postenactment* successor the *option* of transferring the assignment and assuming the signatory operator's liability, it does not address the liability of *preenactment* successors.

Further, § 9711 enumerates the continuing obligations of Individual Employer Plans (IEPs) maintained pursuant to a 1978 or subsequent coal wage agreement.[12] Section 9711(g)(1) provides that "[f]or [the] purposes of" IEPs and the 1992 UMWA Benefit Plan, "[t]he term 'last signatory operator' shall include a successor in interest of such operator." Thus, in § 9711, Congress gave "last signatory operator" a subsection-specific definition that extends the IEP obligations of a preenactment signatory operator to include its "successors in interest."

Those subsections stand in direct contrast to the provisions implicated here: §§ 9701(c)(1), (2), and (4), which define "signatory operator," "related persons," and "last signatory operator," respectively, "[f]or [the] purposes of this section,"

---

[12] The rules applicable to successors of signatory operators who maintain such plans are provided in §§ 9711(g)(1) and (2); § 9711(g)(2) discusses the obligations of a person who becomes a successor of a last signatory operator postenactment, and is nearly identical to § 9706(b)(2).

and *do not* specify that they include or impose liability on the signatory operator's successor in interest.

Despite the unambiguous language of the statute with respect to those entities to whom successor liability attaches, the Commissioner essentially asks that we read into the statute mandatory liability for preenactment successors in interest to signatory operators. This we will not do. "We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship." *Russello, supra,* at 23. Congress wrote the statute in a manner that provides for liability only for successors in interest to *certain* signatory operators. If Congress meant to make a preenactment successor in interest like Jericol liable, it could have done so clearly and explicitly.

Therefore, because the statute is explicit as to who may be assigned liability for beneficiaries and neither the "related persons" provision nor any other provision states that successors in interest to signatory operators may be assigned liability, the plain language of the statute necessarily precludes the Commissioner from assigning the disputed miners to Jericol.

## IV

The Commissioner admits that the "statute does not state *in haec verba* that an assignment may be made to a direct successor in interest of the entity that was the signatory operator itself." Brief for Petitioner 10. Nonetheless, the Commissioner concludes that, in light of the text, structure, and purposes of the Coal Act, such direct successors in interest *are* included within the liability scheme and *should* be responsible for a signatory operator's Combined Fund premiums if the signatory operator itself is defunct and there is no other "related person" still in business. *Ibid.* We address the Commissioner's arguments below.

A

The Commissioner proposes several readings of the statute. First, the Commissioner argues that, because the last sentence of § 9701(c)(2)(A) states that the term "related person" "include[s]" a successor in interest of "any person described in clause (i), (ii), or (iii)," and because these clauses mention the "signatory operator" itself, the signatory operator is "described" in clause (i) by virtue of the express reference. Brief for Petitioner 24.

The text of the statute does not support this reading. Where Congress wanted to include successors in interest, it did so clearly and explicitly. See *supra*, at 452–453. Each category of "related persons" describes a definitive group of persons. § 9701(c)(2). Congress neither created a separate category for signatory operators nor included signatory operators within these categories. It is unlikely that Congress intended to attach liability to a group such as successors in interest to signatory operators through a general clause that was meant to reach persons "described" in one of three explicit categories.

Second, the Commissioner argues that, under § 9701(c)(2)(A)(i), a signatory operator is necessarily a member of a controlled group of corporations that includes itself. Brief for Petitioner 24. This subsection provides that "related persons" include "a member of the controlled group of corporations (within the meaning of section 52(a)) which includes such signatory operator." § 9701(c)(2)(A)(i). Thus, according to the Commissioner's logic, if corporation A is a member of a controlled group that includes corporations A, B, and C, then a "successor in interest" of a member of the group of corporations A, B, and C includes a successor in interest of corporation A. *Ibid.*

Standing alone, the subsection supports the Commissioner's argument that a signatory operator is necessarily a member of a group of corporations that includes itself. But this provision cannot be divorced from the clause that begins

the related persons provision: "A person shall be considered to be *a related person to* a signatory operator if that person is—." § 9701(c)(2)(A) (emphasis added). Under the Commissioner's reading, the signatory operator would be related to itself. But just as it makes little sense to say that I am a related person to myself, it makes little sense to say that a signatory operator is a related person to itself. The statute therefore necessarily implies that a "related person" is a separate entity from a signatory operator. Moreover, the Commissioner's argument only works where the signatory operator is actually part of a "controlled group of corporations." The Commissioner does not account for the situation where a signatory operator is *not* part of a controlled group. And because the Commissioner does not contend that Shackleford was part of such a controlled group of corporations, this argument, in any event, has no force here.

## B

The Commissioner also contends that the background, legislative history, and purposes of the Coal Act confirm that Congress intended that liability for a signatory operator's employees could be placed on the signatory's direct successor in interest.

### 1

As support, the Commissioner turns to the floor statements of Senators Malcolm Wallop and Jay Rockefeller, arguing that, because these Senators sponsored the Coal Act, their views are entitled to special weight. In particular, the Commissioner relies on an explanation of the legislation placed into the record by Senator Wallop, making the point that, in addition to the three categories of related persons, "the statute provides that related persons" includes "(iv) in specific instances successors to the collective bargaining agreement obligations of a signatory operator." 138 Cong.

Rec. 34002 (1992).[13]  The Commissioner also points to Senator Rockefeller's statement that "[t]he term 'signatory operator,' as defined in new section 9701(c)(1), includes a successor in interest of such operator." *Id.*, at 34033.[14]

Floor statements from two Senators cannot amend the clear and unambiguous language of a statute.  We see no reason to give greater weight to the views of two Senators than to the collective votes of both Houses, which are memorialized in the unambiguous statutory text.[15]

---

[13] Placed in its proper context, this statement is entirely consistent with the statutory text.  Senator Wallop noted first that the bill makes "each such related person *fully responsible for the signatory operator's obligation* to provide benefits under the Act should the signatory no longer be in business, or otherwise fail to fulfill its obligations under the Act."  138 Cong. Rec., at 34002 (emphasis added).  After listing the three categories of related persons, Senator Wallop then added category (iv): "*in specific instances* successors to the collective bargaining agreement *obligations* of a signatory operator—are equally obligated with the signatory operator to pay for continuing health care coverage."  *Ibid.* (emphasis added).  To begin with, it must be noted that Senator Wallop did not state that all successors are responsible for the beneficiaries.  Rather, he narrowed the group with the qualifying phrase "in specific instances."  And Senator Wallop did not suggest that responsibility attaches to successors in interest *to signatory operators.*  Instead, the "successors to the collective bargaining agreement obligations" are nothing more than those entities that he previously identifies as "fully responsible for the signatory operator's obligation": the related persons categorized in clauses (i)–(iii).  Consequently, the statement is consistent with the final sentence of the related persons definition which provides that "[a] related person shall also include a successor in interest of any person described in clause (i), (ii), or (iii)." § 9701(c)(2)(A).

[14] We need look to only the statutory text to know that the definition in fact does not include the successor in interest.  See § 9701(c)(1) ("The term 'signatory operator' means a person which is or was a signatory to a coal wage agreement").  See *supra*, at 455.

[15] Despite the dissent's assertion that we should defer to what it characterizes as "*clear evidence of coherent congressional intent*," *post*, at 462 (opinion of STEVENS, J.), the dissent points to only two sentences in the Congressional Record.  Even if we were to believe that floor statements

2

The Commissioner also argues that construing the related person provision to exclude a signatory's direct successor in interest would be contrary to Congress' stated purpose of ensuring that each Combined Fund beneficiary's health care costs is borne (if possible) by the person with the most direct responsibility for the beneficiary, not by persons that had no connection with the beneficiary or by the public fisc. The Commissioner contends that the Court should choose a construction of the statute that effectuates Congress' "overriding purpose" of avoiding a recurrence of the orphan retiree catastrophe, which was caused in large part by operators avoiding responsibility for their beneficiaries by changing their corporate structures, selling assets, or ceasing operations. See Brief for Petitioner 30.

---

can amend clear statutory language, these statements can hardly be characterized as "clear evidence." To begin with, the dissent mischaracterizes Senator Wallop's statement, neglecting to explain its context and to include the qualifying phrase "in specific instances." See *supra*, at 457, n. 13. Absent support from Senator Wallop's statement, the dissent is left only with Senator Rockefeller's explanation. The dissent essentially contends that we should use a single sentence in a long colloquy to effect a major change in the statute. However, the dissent fails to note that the House passed the bill on October 5, 1992, *three days before* Senator Rockefeller made his statement. See 6 Legislative History of the Energy Policy Act of 1992 (Committee Print compiled for the Senate Committee on Energy and Natural Resources by the Library of Congress), p. 4678 (1994) (hereinafter Legislative History). There is no indication that Senator Rockefeller's version of the provision garnered the support of the House, the Senate, and the President. And, given that the House had already passed the bill, the dissent's additional reliance on the *absence* of a response to the Senators' explanation simply makes no sense. See *post*, at 468–469. Moreover, were we to adopt this form of statutory interpretation, we would be placing an obligation on Members of Congress not only to monitor their colleague's floor statements but to read every word of the Congressional Record including written explanations inserted into the record. This we will not do. The only "evidence" that we need rely on is the clear statutory text.

The Commissioner further suggests that the Court of Appeals' construction of the statute leads to the counterintuitive result that a direct successor in interest of a signatory may not be made responsible for a signatory's beneficiaries—even though such successor liability would be supported by the background principles of successorship [16]—while a more distantly related successor in interest of a corporate affiliate of a signatory operator may be made responsible for the signatory's beneficiaries. Thus, the Commissioner appears to request that the Court invoke some form of an absurd results test. *Id.*, at 32 (citing *United States* v. *X-Citement Video, Inc.*, 513 U. S. 64, 70–71 (1994); *United States* v. *Brown*, 333 U. S. 18, 27 (1948)).[17]

Respondents correctly note that the Court rarely invokes such a test to override unambiguous legislation. Moreover, respondents offer several explanations for why Congress would have purposefully exempted successors in interest of a signatory operator from the "related person" definition.

---

[16] The Commissioner asks that the Court apply the background principles of successorship, as articulated in the Court's treatment of labor, employment, and benefit statutes, that a corporate entity's liability under a statutory scheme should be attributed to the entity's direct successor in interest. Brief for Petitioner 36–40. But in the Coal Act, Congress expressly delineated those parties to which it sought to attach responsibility. Where a statute provides an explicit and all-inclusive scheme that does not include successors in interest to signatory operators, and where there is no indication that Congress intended that the statute be supplemented by reference to background principles, we will not import these principles into our analysis.

[17] The dissent makes the conclusory assertion that our "interpretation of the statute . . . recreates the same difficulties that beset the NBCWAs and that Congress explicitly sought to avoid." See *post*, at 471. The dissent, however, provides no data for its conclusory assertion. Nor does it explain how our interpretation "recreates the same difficulties that beset the NBCWAs." *Ibid.* And the dissent ignores the fact that the new scheme broadly expanded the group of persons responsible for beneficiaries. Thus, the fact that Congress declined to attach liability to one group of persons tells us nothing about the new system's viability.

First, respondents argue that coal operators undoubtedly would have opposed legislation that seriously expanded their liability with respect to miners that they had never employed,[18] and that it is hard to imagine that the 1988 signatory companies would have agreed to a compromise that exposed them to open-ended statutory liability linked to decades of buying, selling, and trading property. Brief for Respondents 39–43.

Second, respondents speculate that Congress may have concluded that injecting coal industry successor issues into the Commissioner's task of allocating liability for more than 100,000 UMWA retirees and dependents would consume a disproportionate share of the agency's resources, create gridlock in the assignment process, precipitate endless operator challenges under the Coal Act's administrative review process, and thwart implementation of the program. *Id.*, at 43–45. Finally, respondents suggest that Congress could have been concerned about the adverse impact that successor liability might have had on the valuation and sale of union companies and properties.[19] *Id.*, at 45–46.

Where the statutory language is clear and unambiguous, we need neither accept nor reject a particular "plausible" explanation for why Congress would have written a statute

---

[18] Respondents argue that successor liability covering 40 years of pre-Act transactions could have exploded the number of Combined Fund beneficiaries potentially assignable to the 1988 signatory operators. See Brief for Respondents 41. It would have been difficult for the 1988 signatories to estimate their potential liability under a legislative fix that included successor liability. Thousands of pre-1976 UMWA retirees were potential candidates for assignment to a 1988 NBCWA signatory under such broad based successor liability.

[19] If Congress had retroactively burdened coal asset purchasers for financial shortfalls arising from failures under a private party contract, respondents argue, future purchasers would be wary about paying fair market value for coal property. Such concerns might destabilize the unionized industry's economic underpinning, at a time when many assigned operators might need to raise money to help defray costs imposed by the Act.

that imposes liability on the successors of the companies that fall within the categories of §§ 9701(c)(2)(A)(i)–(iii) but not on successors to the signatory operators themselves. Dissatisfied with the text of the statute, the Commissioner attempts to search for and apply an overarching legislative purpose to each section of the statute. Dissatisfaction, however, is often the cost of legislative compromise. And negotiations surrounding enactment of this bill tell a typical story of legislative battle among interest groups, Congress, and the President. See *supra*, at 445–446, and nn. 6–7. Indeed, this legislation failed to ease tensions among many of the interested parties.[20] Its delicate crafting reflected a compromise amidst highly interested parties attempting to pull the provisions in different directions. See, *e. g.*, 6 Legislative History 4569–4571. As such, a change in any individual provision could have unraveled the whole. It is quite possible that a bill that assigned liability to successors of signatory operators would not have survived the legislative process. The deals brokered during a Committee markup, on the floor of the two Houses, during a joint House and Senate Conference, or in negotiations with the President, however, are not for us to judge or second-guess.

Our role is to interpret the language of the statute enacted by Congress. This statute does not contain conflicting provisions or ambiguous language. Nor does it require a narrowing construction or application of any other canon or interpretative tool. "We have stated time and again that courts must presume that a legislature says in a statute what

---

[20] The UMWA's lobbying efforts precipitated a lawsuit by the Pittston Coal Company, which sued the UMWA for $250 million, alleging "that at the conclusion of the 1989–1990 strike, the union promised not to lobby on behalf of legislation making 'reachback' companies resume payments to the" retiree health system. UMW Denies Breaching Pittston Pact, 17 Coal Outlook, Dec. 6, 1993, 1993 WL 2678868. "Pittston accused the union of violating a promise not to lobby for industry wide taxation to bail out two retiree health funds." UMW, Pittston Reach Tentative Deal, 18 Coal Outlook, June 20, 1994, 1994 WL 2480375.

it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Connecticut Nat. Bank* v. *Germain*, 503 U. S. 249, 253–254 (1992) (quoting *Rubin* v. *United States*, 449 U. S. 424, 430 (1981)) (citations omitted). We will not alter the text in order to satisfy the policy preferences of the Commissioner. These are battles that should be fought among the political branches and the industry. Those parties should not seek to amend the statute by appeal to the Judicial Branch.

### C

The Commissioner's final argument is that, even if the Coal Act did not affirmatively provide that responsibility for combined fund premiums may be imposed on a signatory's direct successor, it was reasonable for the Commissioner to conclude that direct successors of a signatory operator should be responsible for the operator's employees. Congress, however, did not delegate authority to the Commissioner to develop new guidelines or to assign liability in a manner inconsistent with the statute. In the context of an unambiguous statute, we need not contemplate deferring to the agency's interpretation. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984).

Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE O'CONNOR and JUSTICE BREYER join, dissenting.

This case raises the question whether clear evidence of coherent congressional intent should inform the Court's construction of a statutory provision that seems, at first blush, to convey an incoherent message. Today, a majority of the Court chooses to disregard that evidence and, instead, ad-

heres to an interpretation of the statute that produces absurd results. Two Members of Congress—both sponsors of the legislation at issue—have explained that the statute does not mandate such results, and the agency charged with administering the statute agrees. As a partner of the other two branches of Government, we should heed their more reasonable interpretation of Congress' objectives.

The Coal Industry Retiree Health Benefit Act of 1992 (Coal Act or Act), 26 U. S. C. § 9701 *et seq.* (1994 ed. and Supp. V), authorizes the Commissioner of Social Security (Commissioner) to assign responsibility for providing health care benefits for certain retired coal miners and their beneficiaries. It was enacted in response to the financial difficulties that had plagued the National Bituminous Coal Wage Agreements (NBCWAs), a multiemployer, private health care system, established by representatives of the coal industry and the United Mine Workers Association (UMWA). See *Eastern Enterprises* v. *Apfel*, 524 U. S. 498, 511 (1998). The NBCWAs were part of an arrangement in which the UMWA accepted collective-bargaining agreements dictating wages, benefits, and other terms of employment in exchange for, *inter alia*, promises regarding the provision of lifetime health benefits for retired miners. After many of the coal operators who were signatories to the NBCWAs went out of business or withdrew from their coverage, the remaining signatories were forced to assume a share of the health care costs for those operators' employees.

Consequently, the remaining members had an even greater incentive to avoid their obligations under the agreements. *Ibid.* The ensuing downward spiral threatened the NBCWAs' ability to provide health benefits. In evaluating legislative solutions, Congress "was advised that more than 120,000 retirees might not receive 'the benefits they were promised'" during the collective-bargaining process. *Id.*, at 513 (quoting Coal Commission Report on Health Benefits of Retired Coal Miners: Hearing before the Subcommittee on

Medicare and Long-Term Care of the Senate Committee on Finance, 102d Cong., 1st Sess., 45 (1991) (statement of Bituminous Coal Operator's Association Chairman Michael K. Reilly)). Congress' objective in passing the Coal Act was to "identify persons most responsible for plan liabilities" and to establish an order of priority to ensure the long-term viability of the fund. Energy Policy Act of 1992, Pub. L. 102–486, § 19142, 106 Stat. 3037.

To accomplish that goal, the Act directs the Commissioner to assign primary responsibility to a "signatory operator" that formerly employed the particular miners and to persons "related" to that operator. The broad definition of the term "related person" includes three classes of entities associated with the signatory and a catchall sentence stating that a "related person shall also include a successor in interest of any person described in clause (i), (ii), or (iii)."[1] The question in this case is whether the Act permits the Commissioner to assign retirees to a successor of the signatory itself, or just successors of related persons of the signatory.

The Commissioner reads the statute broadly to include direct successors, whereas the Court has adopted a narrower reading that excludes them from responsibility. Because a signatory operator is not "described in" clause (i), (ii), or (iii),

---

[1] Title 26 U. S. C. § 9701(c)(2)(A) (1994 ed.) provides: "A person shall be considered to be a related person to a signatory operator if that person is—

"(i) a member of the controlled group of corporations (within the meaning of [26 U. S. C. § ]52(a)) which includes such signatory operator;

"(ii) a trade or business which is under common control (as determined under [26 U. S. C. § ]52(b)) with such signatory operator; or

"(iii) any other person who is identified as having a partnership interest or joint venture with a signatory operator in a business within the coal industry, but only if such business employed eligible beneficiaries, except that this clause shall not apply to a person whose only interest is as a limited partner.

"A related person shall also include a successor in interest of any person described in clause (i), (ii), or (iii)."

the Court concludes that a successor in interest to a signatory cannot be liable for the retirees of its predecessor under the catchall provision. Thus, the Court reads the Act to assign liability first to the signatory operator, assuming it is still in business, then to any related persons of that signatory, and if none exists or is still in business, to the successor in interest of a related person. Liability can never be assigned to a direct successor—the most logical recipient of liability, after the signatory itself.

Two examples illustrate the absurdity of the Court's reading. First, imagine that corporations "A" and "B" operate coal mines in Kentucky and Illinois, respectively. A and B are affiliated corporations; let us say they are members of the same controlled group of corporations. In 1974, each company became a signatory to one of the coal agreements. Subsequently, they both sell their assets to separate purchasers. Under the Court's reading of the Act, the purchaser of the Kentucky mines would be responsible for the health care costs of the Illinois miners and the purchaser of the Illinois mines would be assigned the retirees of the Kentucky company, but neither purchaser would be liable for its predecessor's retired employees.

Now, consider a slightly different scenario in which A still operates a coal mine, but B runs a dairy farm. They are still members of the same controlled group of corporations, however, only A is a signatory of the 1974 agreement. In this hypothetical, when A and B sell their assets, under the Court's reading of the statute, the purchaser of the dairy farm will be liable for the retired miners' benefits while the purchaser of the coal mine has no liability. If that result is not absurd, it is surely incoherent. Why would Congress order such an odd result?

The answer is simple—Congress did not intend this result. Commenting on the final text of the bill that was ultimately enacted, two of the Senators sponsoring the measure explained their understanding of the statutory text to their col-

leagues. Senator Rockefeller of West Virginia, who spoke "as the original author of this legislation," 138 Cong. Rec. 34034 (1992), unambiguously stated that the term "signatory operator" includes "a successor in interest of such operator." *Id.*, at 34033. And in a written explanation of the measure that he placed in the Congressional Record, Senator Wallop stated that the definition of the term "related person" was "intentionally very broad" and encompassed "successors to the collective bargaining agreement obligations of a signatory operator."[2]

---

[2] It is of particular interest that he did not limit the scope of potential assignees to those in the three subparagraphs of §9701(c)(2)(A). He stated:

"[B]ecause of complex corporate structures which are often found in the coal industry, the number of entities made jointly and severally liable for a signatory operator's obligations under the definition of related persons is intentionally very broad.

"In this regard, the term 'related person' is defined broadly to include companies related to the signatory operator. The Conference Agreement makes each such related person fully responsible for the signatory operator's obligation to provide benefits under the Act should the signatory no longer be in business, or otherwise fail to fulfill its obligations under the Act. Thus, the statute provides that related persons—meaning (i) those within the controlled group of corporations including the signatory operator, using a 50% common ownership test, (ii) a trade or business under common control with a signatory operator, (iii) one with a partnership interest or joint venture with the signatory operator, or (iv) *in specific instances successors to the collective bargaining agreement obligations of a signatory operator—are equally obligated with the signatory operator to pay for continuing health care coverage.*" 138 Cong. Rec. 34002 (1992) (emphasis added).

The meaning of Senator Wallop's reference to "specific instances" is not evident, but he surely did not mean "no instances" as the Court seems to assume. See *ante*, at 457, n. 13. Nor could the phrase "successors to the collective bargaining agreement obligations of a signatory operator" refer to the successors of persons described in clauses (i)–(iii), because members of the same controlled group of corporations, for example, do not assume each other's collective-bargaining agreement obligations. In specific instances, however, direct successors of signatory operators may assume those obligations. See *infra*, at 467–468.

If we assume that Senators Rockefeller and Wallop correctly understood their work product, the provision is coherent. For it is obviously sensible to impose the cost of health care benefits on successors to signatory operators, and equally obvious that there is far less justification for imposing such liability on successors to related companies that are not engaged in coal mining. Moreover, assigning liability to direct successors is consistent with Congress' explicit objective to "identify persons most responsible for plan liabilities." § 19142(a)(2), 106 Stat. 3037.[3] As between the two, the successor to a signatory has more notice that it may be held responsible for its predecessor's liabilities than the successor of a related person of the signatory. In fact, successors to signatories of the 1974 NBCWA are specifically on notice because of a provision in that agreement which states: "[The] Employer promise[s] that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under this Agreement." Article I, National Bituminous Coal Wage Agreement of 1974.

Not only is the direct successor put on notice; presumably it received a lower sale price in exchange for assuming the collective-bargaining agreement obligations of its predecessor. Consider the facts of this case. Respondent, Jericol Mining, Inc., purchased the coal mining assets of Shackleford Coal Co., a signatory to the 1971 NBCWA. The sales con-

---

[3] Senator Wallop emphasized this point in clarifying why liability under § 9701(c) is "intentionally very broad." 138 Cong. Rec., at 34002. As he explained: "The purpose of this provision is to insure that every reasonable effort is made to locate a responsible party to provide the benefits before the cost is passed to other signatory companies which have never had any connection to the individual . . . . Allocation of beneficiaries to an entity or business which continues in business is the basic statutory intent. Thus, the Conference Agreement's overriding purpose is to find and designate a specific obligor for as many beneficiaries in the Plans as possible." *Ibid.*

tract provided that Jericol would assume responsibility for Shackleford's outstanding contracts, including its collective-bargaining agreement. App. 23, 26. The price Jericol paid for Shackleford's assets, therefore, must have reflected the fact that Jericol was taking on Shackleford's commitments to its retirees. By allowing Jericol to escape responsibility for its end of the bargain at this stage, the Court effectively grants it a windfall.

While the Court trumpets the clear language of the statute, the language here is not clear enough to require disregard of "clearly expressed legislative intention to the contrary," *Consumer Product Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102, 108 (1980), or to require us to accept "absurd results," *United States* v. *Turkette*, 452 U. S. 576, 580 (1981) (citing *Trans Alaska Pipeline Rate Cases*, 436 U. S. 631, 643 (1978)). See *infra*, at 469–470. Nevertheless, the Court accepts respondents' claim that, even if the statute produces odd results, this scheme is the product of a legislative compromise that we cannot override. The drafters, according to this theory, may have confronted significant opposition from successors of signatories who would have faced liability under alternative language. Or Congress may have been concerned that imposing liability on successors would create a disincentive for potential purchasers of coal companies' assets.

If the negotiations were as contentious as respondents imagine and if the Act excluded direct successors as the product of horsetrading, then one would expect a response to the statements of two Senators directly contradicting the terms of that legislative bargain. Surely those Senators who disagreed with Senators Rockefeller and Wallop would have said something to set the record straight. To the contrary, there is no evidence in the legislative history of such a compromise. Respondents and *amici* do not cite any evidence supporting this version of events, nor could respond-

ents' counsel when asked specifically during oral argument. Tr. of Oral Arg. 33–35.

The total absence of any suggestion in the legislative history that the Senators had misdescribed the coverage of the Act is itself significant. See *Harrison* v. *PPG Industries, Inc.*, 446 U. S. 578, 602 (1980) (REHNQUIST, J., dissenting) ("In a case where the construction of legislative language . . . makes so sweeping and so relatively unorthodox a change . . . , I think judges as well as detectives may take into consideration the fact that a watchdog did not bark in the night"); *Green* v. *Bock Laundry Machine Co.*, 490 U. S. 504, 527 (1989) (SCALIA, J., concurring in judgment) (when confronted with statutory language that produces an absurd result, it is appropriate "to observe that counsel have not provided, nor have we discovered, a shred of evidence that anyone has ever proposed or assumed such a bizarre disposition"). Absent some response indicating that the Senators mischaracterized the Act, we ought to construe the statute in light of its clear purpose and thereby avoid the absurd results that the majority countenances.

Indeed, the Court's cavalier treatment of the explanations of the statute provided to their colleagues by Senators Rockefeller and Wallop is disrespectful, not only to those Senators, but to the entire Senate as well. For, although the Court does not say so explicitly, it apparently assumes that the Senators were either dissembling or unable to understand the meaning of the bill that they were sponsoring. Neither assumption is tenable. Much more likely is the simple explanation that the Senators quite reasonably thought the term "signatory operator" included successors. This account is certainly consistent with Congress' instructions in the Dictionary Act, 1 U. S. C. § 1, that a reference to a corporation may embrace its successors and assigns even if not expressly mentioned.

The Coal Act defines a "signatory operator" as "a person which is or was a signatory to a coal wage agreement." 26

U. S. C. § 9701(c)(1) (1994 ed.). The term "person" is not defined, but according to the Dictionary Act it includes "corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U. S. C. § 1. And, we know from 1 U. S. C. § 5 that "[t]he word 'company' or 'association', when used in reference to a corporation, shall be deemed to embrace the words 'successors and assigns of such company or association', in like manner as if these last-named words, or words of similar import, were expressed." Therefore, reading the term "signatory operator" to encompass direct successors is compatible with the default rules that Congress provided for interpreting its statutes. Nor does the context indicate otherwise, because Congress clearly authorized the Commissioner to assign retirees to other successors, and extending liability to this category of successors is consistent with the purpose of the Act. Cf. *Rowland* v. *California Men's Colony, Unit II Men's Advisory Council,* 506 U. S. 194, 209–211 (1993) (recognizing that even when "contextual features" contradict the Dictionary Act reading, that interpretation may be appropriate if it would make little sense to adopt a more literal reading); *Wilson* v. *Omaha Tribe,* 442 U. S. 653, 666 (1979); *United States* v. *A & P Trucking Co.,* 358 U. S. 121, 123–124 (1958).

Three additional considerations support reading the Act to cover direct successors. First, this reading was consistently endorsed by the several Commissioners responsible for the administration of the Act, notwithstanding a change in control of the Executive Branch.[4] We have previously attached

---

[4] Although the Social Security Administration has interpreted the meaning of "successor" differently over time (*i. e.,* taking different positions as to whether an asset purchaser qualifies as a successor), it has consistently taken the position that a direct successor can be assigned responsibility for a signatory's employees. See Provisions Relating to the Health Benefits of Retired Coal Miners: Hearing before the House Committee on Ways and Means, 103d Cong., 1st Sess., 24–25 (1993) (statement of then-Acting Commissioner Lawrence H. Thompson) (explaining that miners can be

significance to the fact that after "a new administration took office" an agency concluded that a statutory "term should be given the same definition" as before. *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U. S. 837, 857–858 (1984).

Second, it is consistent with the Court's treatment of successorship issues in other labor cases, in which we have required successors to bargain with a union certified under a predecessor, see *Fall River Dyeing & Finishing Corp.* v. *NLRB*, 482 U. S. 27, 41 (1987), to assume liability for reinstatement and backpay as a result of a predecessor's unfair labor practice, see *Golden State Bottling Co.* v. *NLRB*, 414 U. S. 168, 181–185 (1973), and to arbitrate disputes as provided in a predecessor's collective-bargaining agreement, see *John Wiley & Sons, Inc.* v. *Livingston*, 376 U. S. 543, 548 (1964).

Finally, we should avoid adopting an interpretation of the statute that recreates the same difficulties that beset the NBCWAs and that Congress explicitly sought to avoid. The immediate consequence of the Court's reading is that 86 retired miners will now be unassigned; therefore, their health care expenses will be borne by the remaining signatory operators and their related persons. Assuming there are other retired miners in the same category, today's decision will result in more "orphaned" miners who will draw from the combined fund. To the extent that the cost for their health benefits will be passed along to the other signatory operators, the Court's holding creates an added incentive for the re-

assigned to "the last active signatory operator (or its successor, if the operator is out of business) for whom the miner worked"); Letter to SSA Southeastern Program Service Center (Aug. 8, 1994), App. 110–111 ("[S]uccessors or successors in interest are treated for assignment purposes as if there had been no change of ownership"); Supplemental Coal Act Review Instructions No. 4 (July 1995), App. to Pet. for Cert. 86a ("[T]he Coal Act does permit assignments to 'successors' and 'successors-in-interest' to *defunct* (inactive) signatory operators").

maining signatories to avoid their obligations under the agreements. The result is effectively the same downward spiral that doomed the NBCWAs.[5] *Eastern,* 524 U. S., at 511.

In my judgment the holding in this case is the product of a misguided approach to issues of statutory construction. The text of the statute provides us with evidence that is usually sufficient to disclose the intent of the enacting Congress, but that is not always the case. There are occasions when an exclusive focus on text seems to convey an incoherent message, but other reliable evidence clarifies the statute and avoids the apparent incoherence. In such a case—and this is one—we should never permit a narrow focus on text to obscure a commonsense appraisal of that additional evidence.

I respectfully dissent.

---

[5] For the first three years of the Act, the health care costs for orphaned miners are shared among the signatories. Starting in the fourth year, payment is deducted first from interest earned on the Department of Interior's Abandoned Mine Reclamation Fund (AML), 26 U. S. C. § 9705(b) (1994 ed.). If those funds are exhausted or unavailable, then the costs are shared by the remaining signatories. While the availability of the interest transfers may delay another financial crisis, it should be noted that the AML funds are earmarked for other purposes. See 30 U. S. C. § 1232(g) (1994 ed.); CRS Report, Coal Industry: Use of Abandoned Mine Reclamation Fund Monies for UMWA "Orphan Retiree" Health Benefits, 138 Cong. Rec. 34004, 34006 (1992) ("First priority goes to mining abandonments that could present imminent danger to public health and safety. . . . Any remaining AML funds are designated to eliminate environmental hazards"). Moreover, given the high cost of health care for retired miners, and the likely diminution of the fund's interest earning capacity, see *id.,* at 34006–34007, the interest may not last for long.