In the Matter of BENSAR COMPANY, INC., Debtor.

U.S. BILLIARDS COMPANY, INC., Plaintiff,

v.

Mark GREENBERGER, Trustee

and

BancOhio National Bank, Defendants.

Bankruptcy No. 1–83–01743.
"Contested Docket A".

United States Bankruptcy Court,
S.D. Ohio, W.D.

Jan. 19, 1984.

Kevin Hopper, Milford, Ohio, for debtor.

David J. Frey, Batavia, Ohio, for U.S. Billiards.

Richard Boydston, Cincinnati, Ohio, for BancOhio.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

RANDALL J. NEWSOME, Bankruptcy Judge.

This Chapter 7 adversary proceeding is before the Court pursuant to a motion filed by U.S. Billiards Company, Inc. (hereafter referred to as "U.S.B.") for reclamation and relief from the stay pursuant to 11 U.S.C. § 546(c) and § 362(d). The motion is opposed by BancOhio National Bank, which U.S.B. concedes holds a security interest in the after-acquired inventory of the debtor, Bensar Company, Inc. (hereafter referred to as "Bensar"). The parties have also stipulated that the debtor was insolvent as of June, 1983.

This dispute involves a common carrier which performed its assigned task too efficiently—much to the dismay of its shipping customer. The relevant facts may be stated as follows: for approximately 1½ years prior to June, 1983, U.S.B. had done business with Bensar as a supplier of pool tables. On June 3, 1983 Cliff Rydell, president of Bensar, contacted Leonard Schneller, sales manager of U.S.B. to place an order for 47 pool tables.

Rydell and Schneller agree that they discussed the terms of the purchase during this telephone call, but they do not entirely agree on what terms were finally agreed upon. The testimony of both men indicates that Rydell told Schneller that Bensar was experiencing cash flow problems, and that a special financing arrangement was required for the purchase. Schneller was also told that 20 of the 47 pool tables requested had already been purchased by Bensar's customers.

Schneller testified that a June 8, 1983 letter from U.S.B. to Rydell accurately sets forth all of the terms of the sale (Plaintiff's Ex. 3). According to that letter, Rydell was to send 12 post-dated checks to Schneller in the amount of $3699.78 each immediately upon Rydell's receipt of U.S.B.'s invoice (Plaintiff's Ex. 2). Rydell testified that he received the invoice, but never received the June 8 letter. Furthermore, it was his understanding that no payments on the sale were due until at least 45 days after the pool tables were delivered to Bensar. Payment was to be made by way of post-dated checks from Bensar's customers, a method which the parties had used in the past.

Given Bensar's cash flow problems and the lack of any documentary evidence indicating Rydell's assent to the terms set forth in the June 8, 1983 letter, we credit Rydell's recollection of the terms of the sale over that of Schneller's. It should be noted that under either version of the terms of payment, no money would exchange hands until July 15, 1983. By the same token, we find this factual dispute to be unimportant for purposes of resolving the legal issues raised by the parties. Of great importance however, is the fact that Schneller neither retained nor intended to retain a perfected security interest in the pool tables pursuant to the provisions of Article 9 of the Uniform Commercial Code.

U.S.B. shipped all 47 pool tables to Bensar on June 7 (Plaintiff's Ex. 4). Normally, the trucking company used by U.S.B. employs the "piggy-back" method of shipping by train and then truck. This method usually takes 7 to 10 days, and allows financial arrangements to be completed prior to delivery. Unfortunately for U.S.B., on this occasion the goods were shipped on a gypsy truck, and arrived in Cincinnati the next day. Soon thereafter, the twenty pool tables which had been presold were either picked up by the purchasers or delivered to them by Bensar. An additional five tables were sold off of the truck. U.S.B. has raised no question as to the good faith of any of these sales.

On June 13, 1983 Schneller called Bensar to inquire about payment for the tables. An employee of Bensar informed him that the company was out of business. Schneller told her not to remove the remaining pool tables.

■ On June 16 he telephoned the same Bensar employee and demanded reclamation of the tables. This demand was followed up by a letter on June 17. (Plaintiff's Ex. 5 & 6). Based upon these facts, we find that U.S.B. timely and effectively exercised its reclamation rights under both section 2–702 of the U.C.C. (Ohio Rev.Code § 1302.76(B)) and 11 U.S.C. § 546(c).

The facts reiterated above raise one of the most perplexing and heatedly-debated issues engendered by the Uniform Commercial Code: is a seller's right of reclamation from an insolvent buyer of inventory superior to the rights of a creditor holding a security interest in after-acquired inventory of the debtor?

■ Two additional points should be addressed before launching into a discussion of this issue. First, U.S.B.'s reclamation rights only extend to the pool tables remaining in the debtor's possession, *not* to the proceeds from the tables which were sold. U.S.B. concedes as much in its briefs. *See In re Coast Trading Co.*, 31 B.R. 667, 9 C.B.C.2d 6 (Bkrtcy.D.Or.1982); *Action Industries, Inc. v. Dixie Enterprises, Inc.*, 22 B.R. 855, 860–61 (Bkrtcy.S.D.Ohio 1982). Second, U.S.B. has presented no evidence that the conduct of Bensar or BancOhio was fraudulent or in any way tainted by bad faith.

Turning to the issue raised by the parties, we note initially that our determination is governed by Ohio law, both as to the extent and superiority of U.S.B.'s reclamation rights. *See, In re Madeline Marie Nursing Homes*, 694 F.2d 433, 436–439 (6th Cir. 1982); *In re Federal's, Inc.* 553 F.2d 509 (6th Cir.1977); *In re Vaughn*, 26 B.R. 486, 489 (Bkrtcy.S.D.Ohio 1983); *Action Industries, Inc. v. Dixie Enterprises, Inc., supra.*

U.S.B. posits three arguments in support of its right to have the pool tables now in the possession of the Chapter 7 trustee returned to it. First, it argues that by dint of the printed form language at the bottom of the invoice to Bensar (Plaintiff's Ex. 2)[1], title to the pool tables never passed to Bensar or to its secured creditor, BancOhio. U.S.B. relies upon U.C.C. § 2–401 (Ohio Rev.Code § 1302.42) which reads in pertinent part as follows:

(A) ... Any retention or reservation by the seller of the title (property) in goods

---

1. That language is included on all of U.S.B.'s invoices, and reads as follows: "Title retained by vendor until financial arrangements are completed or vendor executes trade acceptance."

shipped or delivered to the buyer is limited in effect to a reservation of a security interest . . . [T]itle to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

(B) Unless otherwise explicitly agreed, title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods. . .

■ Neither the statutory language quoted above nor any of the evidence presented by the parties supports U.S.B.'s contention regarding the passage of title. There is no evidence that the parties "explicitly agreed" that U.S.B. would retain title until financial arrangements were completed. Indeed, Schneller admitted that the printed language at the bottom of Plaintiff's Ex. 2 was never even mentioned in his discussions with Rydell.

Furthermore, Schneller was well-aware of the fact that twenty of the pool tables which Rydell ordered had been pre-sold. Thus, he must have intended that title would pass to Bensar upon delivery, so that Bensar could complete its sales transactions with its customers. At the very least, Bensar held the status of a person with voidable title empowered "to transfer a good title to a good faith purchaser for value." U.C.C. § 2–403(1) (Ohio Rev.Code § 1302.-44(A)); 3A R. Duesenberg & L. King, *Sales and Bulk Transfers under the Uniform Commercial Code* § 13.03[4] at 13–37 (1983).

■ As an alternative argument under U.C.C. § 2–401, U.S.B. asserts that it retained a security interest in the pool tables which is superior to that of BancOhio's. U.S.B. claims that it retained somehow a security interest in the pool tables by way

of the title retention language on its invoice to Bensar. Again, neither the facts nor the law support this view. There is absolutely no evidence that the parties intended the language on the invoice to create a security interest, or that a security interest was even discussed. In the absence of a writing signed by the parties which evidences an intention to retain a security interest in the pool tables, U.S.B.'s argument must be rejected. See, *DeVita Fruit Co. v. FCA Leasing Corp.*, 473 F.2d 585 (6th Cir.1973).

■ U.S.B. next asserts that U.C.C. § 2–702(2) (Ohio Rev.Code § 1302.76(B))[2] creates an Article 2 security interest by its own terms which is superior to that of BancOhio, and which does not require perfection under U.C.C. § 9–113 (Ohio Rev. Code § 1309.11).[3] This argument must also be rejected. As was held in *In re Mel Golde Shoes, Inc.*, 403 F.2d 658, 660 (6th Cir.1968), the language of U.C.C. § 2–702 does not create a "security interest" as defined in U.C.C. § 1–201(37) (Ohio Rev.Code § 1301.-01(KK)). Section 9–113 is equally unavailing, since it merely describes the import of Article 2 security interests, not the source of such interests. *In re PFA Farmers Market Association*, 583 F.2d 992, 998 (8th Cir. 1978).

U.S.B.'s final argument gives us greater pause. It asserts that the right of reclamation established in U.C.C. § 2–702 is equivalent to the right of a defrauded seller to repossess goods under the common law, and that as a matter of equity such right is superior to that of a secured creditor holding a perfected security interest.

■ Neither the case law nor the U.C.C. supports this argument. Our analysis of the applicable statutory provisions begins

---

**2.** "Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after the receipt. . ."

**3.** "A security interest arising solely under sections 1302.01 to 1302.98, inclusive, of the Revised Code is subject to the provisions of sections 1309.01 to 1309.50, inclusive, of the Revised Code except ·that to the extent that and

so long as the debtor does not have or does not lawfully obtain possession of the goods:

(A) no security agreement is necessary to make the security interest enforceable; and

(B) no filing is required to perfect the security interest; and

(C) the rights of the secured party on default by the debtor are governed by sections 1302.01 to 1302.98, inclusive, of the Revised Code."

with U.C.C. § 2–702(3) (Ohio Rev.Code § 1302.76(C)), which reads as follows:

> The seller's right to reclaim under division (B) of this section is subject to the rights of a buyer in ordinary course or other good faith purchaser or lien creditor under section 1302.44 of the Revised Code...

We find that secured creditors who act in good faith qualify as good faith purchasers under U.C.C. § 2–702(3). Under U.C.C. § 1–201(32) (Ohio Rev.Code § 1301.01 (FF)), a "purchase":

> ... includes taking by sale, discount, negotiation, mortgage, pledge, lien, issue or reissue, gift, or any other voluntary transaction creating an interest in property.

Since BancOhio's after-acquired interest in the debtor's inventory was created through a voluntary transaction, and since the bank has acted in good faith, its rights as a good faith purchaser are superior to those of U.S.B. as a reclaiming seller under U.C.C. § 2–702(3). *In re Samuels & Co.,* 526 F.2d 1238 (5th Cir.1976), *cert. denied* 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976); *In re McLouth Steel Corp.,* 22 B.R. 722 (Bkrtcy.E. D.Mich.1982); *In re Bowman,* 25 U.C.C.Rep. Serv. 738 (Bkrtcy.N.D.Ga.1978); *see also Toyota Industrial Trucks U.S.A., Inc. v. Citizens National Bank of Evans City,* 611 F.2d 465, 473 n. 6 (3rd Cir.1979); 3A R. Duesenberg & L. King, *Sales & Bulk Transfers*

*under the Uniform Commercial Code* § 13.-03[4][i] at 13–28 (1983).

U.S.B. has cited *In re Mel Golde Shoes, Inc.,* 403 F.2d 658 (6th Cir.1968) and *In re Federal's, Inc.,* 553 F.2d 509 (6th Cir.1977) as requiring a different conclusion in this case. We disagree. In both of those cases the Court was concerned with the competing rights of reclaiming sellers and *lien creditors,* not creditors holding perfected security interests. It appears that the *Federal's* Court was well-aware of this distinction when it quoted the following passage from *In re Richards,* 455 F.2d 281, 284 (6th Cir.1972):

> A Trustee in Bankruptcy acquires title to the assets of a bankrupt by operation of the law. *He is not an innocent purchaser for value but takes title to the bankrupt's property subject to all liens, claims and equities thereon.* He has the lien of an execution creditor, which is about the lowest form of security. *Quoted at* 553 F.2d at 513. (emphasis added).

In holding that the rights of a reclaiming seller under U.C.C. § 2–702(2) are superior to the rights of a bankruptcy trustee as a hypothetical lien creditor under § 70(c) of the Bankruptcy Act, the Court observed that:

> The contrary view would endow the trustee with almost all of the qualities of a bona fide purchaser or mortgagee for present value. 553 F.2d at 514[4]

**4.** Because the Ohio version of the Uniform Commercial Code resolves the issue posed, a review of pre-U.C.C. Ohio law does not appear to be necessary under the holding of *Federal's.* We note, however, that contrary to U.S.B.'s assertions, Ohio Courts have never presumed fraud where a buyer purchased goods on credit at a time when he was insolvent. As was noted in the syllabus of *Talcott v. Henderson,* 31 Ohio St. 162 (1877):

> 1. A contract for the purchase of goods on credit, made with intent on the part of the purchaser not to pay for them, is fraudulent; and if the purchaser has no reasonable expectation of being able to pay, it is equivalent to an intention not to pay.
> 2. But where the purchaser intends to pay and has reasonable expectations of being able to do so, the contract is not fraudulent, although the purchaser knows himself to be

insolvent and does not disclose it to the vendor, who is ignorant of the fact.

*See also, Cincinnati Ry. Supply Co. v. Hartlieb,* 214 F. 177 (6th Cir.1914). To the extent that the official comments to U.C.C. § 2–702(2) view a sale to an insolvent buyer as fraudulent *per se,* such view must give way to Ohio's judicial pronouncements.

Questions regarding the priority and extent of rights under the common law of Ohio are not so easily resolved. At least as to certain kinds of sales, such matters were often governed by statute. *See, e.g., Speyer & Co. v. Baker,* 59 Ohio St. 11, 51 N.E. 442 (1898); *Krug v. National Cash Register Co.,* 13 Ohio Dec. 735, 1 N.P.N.S. 273 (Super.Ct.1903). As a general rule, however, a seller had no right to reclaim goods from a third party purchaser or lien holder of an insolvent buyer unless fraud or bad faith were shown. *See Schroth v. Monarch Fence Co.,* 229 F. 549, 551 (6th Cir.1916)

While the result reached in this case may be a harsh one, we note that U.S.B. could have avoided it by retaining a perfected purchase money security interest in the pool tables and notifying BancOhio of its security interest. *In re Samuels & Co.,* 526 F.2d 1238, 1247–1248 (5th Cir.1976) (en banc); U.C.C. § 9–107 (Ohio Rev.Code § 1309.05); U.C.C. § 9–312(3) (Ohio Rev.Code § 1309.-31(C)).

For the reasons stated above, U.S.B.'s motion for reclamation and relief from the stay are hereby DENIED. The foregoing shall constitute this Court's Findings of Fact, Opinion and Conclusions of Law.

IT IS SO ORDERED.

(Under Ohio or Michigan law, seller had no right of reclamation against a bankruptcy trus-

tee unless fraud established); *Talcott v. Henderson, supra.*