In re PHAR–MOR, INC., et al., Debtors.

No. 01–44007.

United States Bankruptcy Court, N.D. Ohio.

Nov. 12, 2003.

Michael A. Gallo, Esq. and Timothy M. Reardon, Esq., Nadler Nadler & Burdman Co., LPA, Youngstown, OH.

Mark B. Joachim, Esq., Morrison & Foerster LLP, New York City.

Joseph F. Hutchinson, Jr., Esq. and Marc B. Merklin, Esq., Brouse McDowell, Cleveland, OH.

Scott L. Hazan, Esq., Brett H. Miller, Esq. and Scott A. Steinberg, Esq., Otterbourg, Steindler, Houston & Rosen, P.C., New York City.

American Leather Specialities Corp., Attn: Robert Weinberg, Brooklyn, NY.

Carl D. Rafoth, Esq., Friedman & Rummell Co., L.P.A., Youngstown, OH.

Michael S. Tucker, Esq., Ulmer & Berne LLP, Cleveland, OH.

Jeffrey K. Garfinkle, Esq. and J. Alexandra Rhim, Esq., Buchalter, Nemer, Fields & Younger, Newport Beach, CA.

Robert J. McBride, Esq., Day, Ketterer, Raley, Wright & Rybolt, Ltd., Millennium Centre, Canton, OH.

Jeffrey M. Levinson, Esq., Margulies & Levinson LLP, Cleveland, OH.

I. William Cohen, Esq., Pepper Hamilton LLP, Detroit, MI.

Harry W. Greenfield, Esq., Buckley, Green & Bluso, Cleveland, OH.

Joseph D. Frank, Esq. and Micah R. Krohn, Esq., Freeborn & Peters, Chicago, IL.

Robert C. Folland, Esq., Sean A. Gordon, Esq. and Andrew L. Turscak, Jr., Esq., Thompson Hine LLP, Cleveland, OH.

Joseph T. Stapleton, Esq., Montgomery, McCracken, Walker & Rhoads, LLP, Philadelphia, PA.

Morton R. Branzburg, Esq., Klehr, Harrison, Harvey, Branzburg & Ellers, LLP, Philadelphia, PA.

Kent A. Lang, Esq. and Suzanne K. Weathermon, Esq., Lang & Baker, PLC, Scottsdale, AZ.

Steven N. Cousins, Esq., David L. Going, Esq. and Susan K. Olsen, Esq., Armstrong Teasdale LLP, St. Louis, MO.

Leo Fox, Esq., New York City.

Andrew W. Suhar, Esq., Youngstown, OH.

Philip R. Wiese, Esq. and Clay K. Keller, Esq., Buckingham, Doolittle & Burroughs, LLP, Akron, OH.

Richard M. Kremen, Esq. and Maria Ellena Chavezruark, Esq., Piper Rudnick LLP, Baltimore, MD.

Lynn B. Griffith, III, Esq., Letson, Griffith, Woodall, Lavelle & Rosenberg Co., L.P.A., Warren, OH.

Matthew J. Stickel, Esq., Kohner, Mann & Kailas, S.C., Milwaukee, WI.

James G. Floyd, Esq. and Leo J. Puhalla, Esq., Newman, Olson & Kerr, Youngstown, OH.

Gordon J. Toering, Esq., Warner Norcross & Judd LLP, Grand Rapids, MI.

Union Wadding Company, Attn: Louise Bucko, Pawtucket, RI.

Wanda Borges, Esq., Borges & Associates, LLC, Syosset, NY.

Collegeware USA, Inc., Attn: Jack J. Ezon, New York City.

Heidi J. Sorvino, Esq., Bryan Cave LLP, New York City.

Saul Eisen, Cleveland, OH, United States Trustee.

## MEMORANDUM OPINION

WILLIAM T. BODOH, Chief Judge.

This cause is before the Court on the motion of Phar–Mor, Inc. and affiliated debtors (collectively, the "Debtors") for entry of an order determining reclamation claims to be general unsecured claims and objection to allowance of such claims as entitled to priority. American Leather

Specialities Corp., Paper Magic Group, Inc., Magco Incorporated, Bonne Bell, Inc., McKesson Corporation, Fleming Companies, Inc., Liquidity Solutions, Inc., Proctor & Gamble Distributing Corporation, Reckitt Benchiser, McCormick & Co., Wyeth Consumer Products, Master Foods USA, Pepsi–Cola Company, Checkpoint Systems, Inc., Hershey Foods Corporation, The Dial Corporation, Bayer Corporation, CCA Industries, Inc., Golden Valley Microwave Foods, Inc., Sara Lee Knit Products, Ross Products Division Abbott Laboratories, Inc., Gray & Company, Kimberly–Clark Corporation, Blueberry Confections, Inc., Union Wadding Company, Pfizer, Inc., Collegeware USA, Inc., Glaxo Smith Kline, and Unilever HPC USA (collectively the "Vendors") have filed objections to Debtors' motion for entry of an order determining reclamation claims to be general unsecured claims and allowance of such claims as entitled to priority. The Bank of New York has filed a joinder to Debtors' motion and objection. A hearing was held on this matter on June 10, 2003. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334(b). The following represents this Court's findings of fact and conclusions of law pursuant to FED. R. BANKR. P. 7052.

## DISCUSSION

### I. FACTS

On September 24, 2001, Debtors filed their voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. Debtors continue to operate their businesses and manage their assets as Debtors–in–Possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. Prior to the petition date, in the ordinary course of their businesses, Debtors purchased and received goods from various suppliers for use in the operation of their deep discount drug store chain. Both be-

fore and after the petition date, Debtors received reclamation demands from Vendors claiming rights of reclamation pursuant to applicable state law and § 546(c) of the United States Bankruptcy Code (the "Reclamation Demands").

On October 5, 2001, 11 days after Debtors' cases commenced, Debtors served and filed a notice of hearing upon Debtors' motion for an order (A) prohibiting third parties from interfering with Debtors' receipt, use or disposition of goods, and (B) establishing procedures for the liquidation and treatment of reclamation claims ("Reclamation Procedures Motion"). Debtors stated in their Reclamation Procedures Motion that:

> Under state law, as made applicable to these proceedings by Section 546(c) of the Bankruptcy Code, certain of the Vendors may have the right to reclaim goods sold to the Debtors prior to the Filing Date. However, as of the date hereof, the goods for which Reclamation Demands have been made have either been incorporated into the Debtors' preexisting inventory or have been sold in the ordinary course of the Debtors' business operations. Thus, it would be either impossible or impractical to segregate and return such goods at this time.

> . . . . .

> Debtors have determined that it is in the best interests of their estates to implement a consensual procedure for the liquidation and treatment of the Reclamation Demands, and for the resolution of disputes as to the specifics of individual Reclamation Demands. Such a procedure would avoid, in large part, the expensive and burdensome litigation necessarily attendant with defending reclamation claims.

### RELIEF REQUESTED

Pursuant to Section 546(c)(2) of the Bankruptcy Code, the Court may deny reclamation to a Vendor with a valid and enforceable right of reclamation only if it: (i) grants the claim of such Vendor an administrative expense priority; or (ii) secures the claim by a lien. Most, if not all, of the goods for which Reclamation Demands have been made have either been sold in the daily operation of the Debtor's [sic] retail operations or integrated into the Debtors' inventories, such that identification of specific goods is not feasible. In addition, the granting of liens to reclamation claimants could violate the agreements governing the Debtors' post-petition financing arrangements. Accordingly, granting liens on such goods would be impractical, and in most cases, impossible.

Consequently, the Debtors propose that each Vendor be granted an administrative expense priority claim under Section 503(b) in the amount (if any) of its allowed reclamation claim, with the amount of such allowed reclamation claim to be subject to the resolution of all of the various defenses set forth above. The Debtors also request that the Court, pursuant to Section 546(c)(2)(A) of the Bankruptcy Code, approve the following procedures for the determination of the allowed amount of each Vendor's reclamation claim.

\*    \*    \*    \*    \*    \*

Following the determination of all of the Vendors' Reclamation Claim Amounts, in accordance with the foregoing procedures, the Debtors may commence further proceedings to determine the extent to which the Reclamation Claim Amounts are subject to further defenses by reason of liens granted to the Debtors' secured creditors. In the alternative, the Debtors may propose to resolve

such issues through a proposed plan of reorganization that specifies the extent to which the Reclamation Claims shall be treated as allowed administrative expense priority claims.

(Reclamation Procedures Motion ¶¶ 8, 10–12, Oct. 5, 2001, Doc. No. 71.) The proposed procedure required each reclaiming seller to provide additional information to Debtors regarding its reclamation claim within 30 days. (*Id.* at ¶ 12(a).) Once that information was provided to Debtors, Debtors then had 90 days to file and serve on each of the reclaiming creditors their own report setting forth the value of the reclamation claims as determined by Debtors. (*Id.* at ¶ 12(b).) Once Debtors' report was filed and served, each reclaiming seller then had 20 days to object to the report. (*Id.* at ¶ 12(c).) The proposed procedure did not purport to adjudicate any of the substantive rights of the reclamation creditors. Debtors sought to defer the resolution of the reclamation claimants' statutory rights to assert administrative claims or liens as provided under § 546(c) of the United States Bankruptcy Code.

On January 9, 2002, the Court granted the Reclamation Procedures Motion and entered the order (A) prohibiting third parties from interfering with Debtors' receipt, use or disposition of goods and (B) establishing procedures for the liquidation and treatment of reclamation claims ("Reclamation Procedures Order"). The Reclamation Procedures Order adopts the procedure for dealing with the Reclamation Demands set forth in Debtors' Reclamation Procedures Motion in that it gave Vendors 30 days to provide additional information to Debtors regarding their reclamation claims and Debtors 90 days thereafter to file and serve on each of the reclaiming creditors their own report setting forth the value of the reclamation claims as determined by Debtors. (Recla-

mation Procedures Order 1–2, Jan. 9, 2002, Doc. No. 383.)

The Reclamation Procedures Order also provides that after the factual disputes were resolved and the amount of the reclamation claims determined, Debtors would either "commence further proceedings to determine the extent to which the Reclamation Claim Amounts are subject to further defenses by reason of liens granted to the Debtors' secured creditors," or alternatively, "propose to resolve such issues through a proposed plan of reorganization that specifies the extent to which the Reclamation Claims shall be treated as allowed administrative expense priority claims." (*Id.* at 3.) The Reclamation Procedures Order further provides:

> The foregoing procedures shall constitute the Vendors' sole remedies with respect to their Reclamation Demands. Vendors shall not be required to initiate adversary proceedings or to take any procedural steps (other than those set forth herein) in order to preserve or perfect their Reclamation Demands. Vendors and other third parties are also prohibited and enjoined from interfering with the Debtors' receipt, use or disposition of goods.

(*Id.* at 4.)

Pursuant to the Reclamation Procedures Order, Vendors filed reclamation claim reports which set forth the values of the goods that were the subject of the Reclamation Demands filed before and after the petition date. On April 9, 2002, Debtors filed their reclamation claim report (the "Report"). The Report provides a detailed analysis of the approximately 141 reclamation claims asserted against Debtors, with an asserted value of Eighteen Million Four Hundred Fifty Thousand Forty–Five and 39/100 Dollars ($18,450,045.39). (Report ¶ 6, Apr. 9, 2002, Doc. No. 601.) The Report contains information regarding the dates the Reclamation Demands were received, the asserted amount of the Reclamation Demands, the value of the products received, the estimated value of the products in the possession of Debtors at the date the Reclamation Demands were received and Debtors' recommended reclamation amount for each Vendor. The Report provides there is no basis to deny some of the reclamation claims Debtors now seek to have relegated to the status of general unsecured claims.[1]

Prior to filing for bankruptcy, Debtors entered into a loan and security agreement ("Pre–Petition Credit Agreement") dated as of November 16, 2000 with certain financial institutions ("Pre–Petition Lenders") and Fleet Retail Finance, Inc. as agent ("Agent"). The loans made pursuant to the Pre–Petition Credit Agreement were secured by substantially all of Debtors' assets including, but not limited to, accounts, inventory, general intangibles, goods, fixtures, chattel paper, money, cash, or cash equivalents relating thereto, proceeds, excessions, substitutions, replacements, rents, profits, and products of the aforementioned property. On the petition date, Debtors were liable to Pre–Petition Lenders in the principal amount of One Hundred Three Million Five Hundred Ten Thousand Dollars ($103,510,000.00).[2] No

---

1. Exhibit A, which is attached to the Report, uses a numbering scheme to indicate the basis Debtors maintain some of the reclamation claims should be denied. The absence of numbers in some of the "Basis for Disallowance" spaces indicates there is no basis to deny some of the reclamation claims Debtors seek to relegate to the status of general unsecured credits in their motion.

2. Page 4 of the Final DIP Order provides:
   Prior to the Petition Date, the Debtors entered into the Pre–Petition Loan Agreement, pursuant to which the Pre–Petition Lenders

portion of this pre-petition debt was listed in Debtors' schedules as being unsecured. (Debtors' Statement of Financial Affairs and Schedules of Assets and Liabilities, Nov. 21, 2001, Doc. No. 264.)

On the petition date, Debtors moved for approval of a debtor-in-possession credit facility (the "DIP Facility"). This Court entered an interim order approving the DIP Facility on September 24, 2001 ("Interim DIP Order"). On October 23, 2001, this Court entered a final order approving the DIP Facility ("Final DIP Order"). The Final DIP Order authorized Debtors to borrow up to One Hundred Thirty–Five Million Dollars ($135,000,000.00) and included provisions that related to the Pre–Petition Credit Agreement. (Final DIP Order 5 ¶ 2(c), Oct. 23, 2001, Doc. No. 148.) Under the Interim and Final DIP Orders Debtors were authorized to, and did in fact, repay all obligations owed to Pre–Petition Lenders under the Pre–Petition Credit Agreement.[3] These payments were ratified and confirmed in the Final DIP Order.

Upon receipt by Pre–Petition Lenders of all amounts owed to them under the Pre–Petition Credit Agreement, any liens or security interests granted in favor of Pre–Petition Lenders securing the pre-petition obligations on any asset of Debtors or otherwise were deemed released, terminated and extinguished.[4] The Final DIP Order did not assign and transfer from Pre–Petition Lenders to the lenders under the DIP Facility ("DIP Lenders") the pre-petition liens and security interests that secured the obligations arising under the Pre–Petition Credit Agreement. Instead, the Final DIP Order gave Debtors the authority to grant DIP Lenders new liens with priority over any other security, mortgage, collateral interest or lien on all

---

extended a working capital facility providing for revolving credit loans and letters of credit. The Debtors stipulate and agree that as of the Petition Date, the Debtors were indebted to the Pre–Petition Lenders in the approximate principal sum (including amounts available to be drawn under outstanding pre-petition letters of credit) of $103,510,000.00, plus accrued interest, costs, fees, and professional fees and expenses, and all other Liabilities as defined in the Pre–Petition Loan Agreement (collectively, hereinafter the "**Pre–Petition Obligations**").

3. Indeed Page 20 of the Disclosure Statement filed on January 23, 2003 provides:

On the Commencement Date, the Debtors secured a $135 million Debtor–In–Possession Revolving Credit Facility (the "DIP Credit Facility") financing through Fleet, which was used to satisfy the Fleet Pre–Filing Indebtedness and to fund the Debtors' operations through its attempted reorganization process. Pursuant to an Order dated October 23, 2001, the Bankruptcy Court approved the DIP Credit Facility.

4. Paragraph 8 on Page 6 of the Final DIP Order provides:

Subject only to Paragraph 9 of this Order, the Debtors on behalf of themselves and their estates and their successors, including any subsequently appointed Trustee hereby: (i) release and discharge the Pre–Petition Agent and the Pre–Petition Lenders together with their affiliates, agents, attorneys, officers, directors and employees from any and all claims and cause of action arising out of, based upon or related to the Pre–Petition Loan Agreement; (ii) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability (under sections 510, 544, 545, 547, 548, 550, 552 or 553 of the Bankruptcy Code or otherwise) or the Pre–Petition Obligations or the security interests and liens granted to secure Pre–Petition Obligations, and (iii) agrees, without further Court order, to the allowance of the pre-petition claims of the Pre–Petition Agent and the Pre–Petition Lenders as fully secured in an amount not less than the Pre–Petition Obligations pursuant to sections 502 and 506 of the Bankruptcy Code.

of Debtors property.[5] The liabilities under the DIP loan were also granted the status of super-priority claim over all allowed administrative expense claims. (*Id.* at 8 ¶ 14.)

The Final DIP Order addressed the rights of the reclamation creditors. The Final DIP Order provided the post-petition liabilities under the DIP Facility would have priority over all reclamation claims under § 546(c). The Final DIP Order provides:

> The Liabilities under the Loan Agreement shall be an allowed administrative expense claim (the **"Super–Priority Claim"**) with priority (except as otherwise provided in Paragraph 16 below) under Bankruptcy Code Section 364(c)(1) and otherwise over all administrative expense claims and unsecured claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code Section 105, 326, 330 (except as otherwise provided in Paragraph 16, below), 331, 503(a), 503(b), 507(a), 507(b), *546(c)*, and 1114.

(*Id.* (emphasis added).) The Final DIP Order also prohibits Debtors from returning the goods constituting collateral under § 546(c) or 546(g) of the Bankruptcy Code. (*Id.* at 10 ¶ 17(c).) Nothing in the Final DIP Order prohibited granting reclamation claimants an administrative priority claim that was junior to any such claim held by DIP Lenders.

After the commencement of Debtors' Chapter 11 cases, Debtors determined it was in the best interests of the estates to eliminate and terminate operations at 65 of their non-core retail stores. On October 9, 2001, Debtors held an auction in order to solicit bids related to the sale of inventory, furniture, fixtures and equipment located at the 65 locations. Debtors ultimately entered into an agency agreement with a joint venture comprised of Hilco Merchant Resources, LLC and The Ozer Group, LLC (collectively, the "GOB Agent") regarding the termination of operations at the 65 retail stores. On October 10, 2001, the Court entered an order authorizing Debtors to sell their assets by conducting "going-out-of-business" sales ("GOB I Sales") at the 65 locations. The Debtors received approximately Thirty Million Six Hundred Thirty Thousand Dollars ($30,-630,000.00) in proceeds from the GOB I Sales. (Disclosure Statement 22, Jan. 23, 2003, Doc. No. 1495.) Pursuant to the agency agreement, these proceeds were deposited into an account established by the GOB Agent.

Despite Debtors' efforts to reduce costs and expenses, Debtors continued to suffer operating losses. Based on these losses, Debtors decided to direct their efforts toward effecting an orderly wind-down of their operations. Debtors solicited offers from the liquidation of their inventory through additional "going-out-of-business" sales. On July 3, 2002, Debtors filed a motion with the Court seeking authority to sell substantially all of their remaining assets and to conduct any associated "going-out-of-business" sales. On July 18, 2002, the Court entered an order authorizing Debtors to sell substantially all of their assets by conducting "going-out-of-business" sales ("GOB II Sales"). Debtors executed a second agency agreement with GOB Agent and commenced the sale of substantially all of their assets. Debtors received approximately One Hundred

---

**5.** Paragraph 10 on Page 7 of the Final DIP Order provides: "The Liens to be created and granted to the Agent, as provided herein, are created pursuant to Bankruptcy Code Sections 364(c)(2), 364(c)(3) and 364(d)." (emphasis added).

Three Million Seven Hundred Ninety–Three Thousand Dollars ($103,793,000.00) in proceeds from the GOB II Sales. (*Id.*)

The DIP operating reports for July 2002 to January 2003 reveal that the DIP loan of One Hundred Thirty–Five Million Dollars ($135,000,000.00) was paid off by the week of July 20–27, 2002. The DIP operating reports also reveal that from August 2002 to January 2003 Debtors received approximately One Hundred Fifty–Four Million Four Hundred Eighty–Three Thousand Twenty Dollars ($154,483,020.00). Some of these revenues, undoubtedly, were used to fund the costs of the liquidation or sale of substantially all of Debtors' assets.

On January 23, 2003, Debtors filed their disclosure statement pursuant to § 1125 of the Bankruptcy Code for first amended joint plan of liquidation dated January 23, 2003, proposed jointly by Debtors and the Official Committee of Unsecured Creditors ("Disclosure Statement"). The Disclosure Statement provides both Pre–Petition Lenders and DIP Lenders have been paid in full. The Disclosure Statement confirms that the Pre–Petition Lenders were paid in full pursuant to the Interim DIP Order from the DIP Facility. (*Id.* at 20.) The Disclosure Statement also confirms that DIP Lenders were paid in full through the proceeds of GOB I Sales and GOB II Sales. According to the Disclosure Statement:

> From the GOB Sales Proceeds, the Debtors have paid in full the amounts owed to Fleet pursuant to the DIP Credit Facility. The Fleet obligation on September 24, 2001 (prior to GOB I

Sales) was $91,777,000 and on July 19, 2002 (prior to GOB II Sales) was $35,489,000. In addition, the Debtors have repaid substantially all of the obligations they incurred during the operations of their businesses as Debtors in Possession in the ordinary course of their business affairs.

(*Id.* at 22.) The Disclosure Statement also provides for the payment of reclamation claims as administrative expenses.[6]

Debtors' monthly operating report as of November 30, 2002 reflects that cash in the amount of Fifty–Six Million Dollars ($56,000,000.00) is on hand and that the value of the significant remaining assets of Debtors (primarily consisting of deposits, accounts receivable and certain prepaid expenses) is approximately Eight Million Five Hundred Thousand Dollars ($8,500,000.00). The total funds to be distributed as of November 30, 2002 total Sixty–Four Million Five Hundred Thousand Dollars ($64,500,000.00). Thirty Million Three Hundred Thousand Dollars ($30,300,000.00) is allotted toward the payment of general unsecured claims, which total One Hundred Eighty–Five Million Five Hundred Thousand Dollars ($185,500,000.00). This distribution, however, explicitly excludes consideration of any proceeds which may be received from causes of action described in the Disclosure Statement.

On February 13, 2003, Debtors filed a motion seeking the entry of an order determining reclamation claims to be general unsecured claims. Debtors object to the allowance of reclamation claims as entitled to priority. Debtors maintain that all of the goods that were subject to Vendors'

---

**6.** Page 12 of the Disclosure Statement allots Ten Million Dollars ($10,000,000.00) for the payment of reclamation claims. Reclamation claims are listed under the heading "Administrative" along with Accrued Reorganization Fees, McKesson, Inc. Administrative Obli-gations Per Court Order, Post–Petition Obligations, Employee Administrative Claims Per Court Order, and Projected Operating Expenses and Professional Fees to Conclusion of Case.

Reclamation Demands have been sold, and the proceeds thereof have been automatically applied to repay Debtors' obligations under the DIP Facility. Debtors further assert that Debtors' inventory was the subject of valid pre-petition liens that were preserved to Agent under the DIP Facility. Accordingly, Debtors argue that all Vendors' reclamation claims are "subject to" the prior claims of the lenders under the DIP Facility, and as such are not entitled to administrative expense priority or to a replacement lien under § 546(c)(2) because, as previously stated, the proceeds generated by the sale of goods subject to Vendors' Reclamation Demands have been applied to Debtors' obligations under the DIP Facility. Debtors maintain that the DIP Facility has taken the entire value of the goods subject to the reclamation claims, thereby rendering Vendors' administrative expense claims worthless.

Vendors' objections to Debtors' motion are legion. First, numerous Vendors argue that since they have satisfied all the tests to assert their right to reclamation under the Bankruptcy Code and state law, they are automatically entitled to either an administrative priority or a replacement lien securing the full amount of their claims under 11 U.S.C. § 546(c). Second, Vendors argue that while the goods sought to be reclaimed were subject to Pre–Petition Lenders' security interests, Pre–Petition Lenders were over-secured on the date of petition and were paid in full from the proceeds of the DIP Facility. Accordingly, Vendors argue Pre–Petition Lenders' security interests have not rendered Vendors' claims valueless. Third, Vendors argue that Debtors are estopped from arguing against the allowance of their reclamation claims by this Court's prior orders. The Reclamation Procedures Order enjoined Vendors from recovering their goods. Accordingly, it would be inequitable to permit Debtors to use the consumption of the goods Vendors were enjoined from recovering as a defense to the reclamation claims themselves. Moreover, the Disclosure Statement contains a representation that the reclamation claims are included as administrative expenses. Fourth, Vendors argue Debtors have failed to prove the goods were in fact sold and that all the sale proceeds were remitted to DIP Lenders. Fifth, Vendors argue that they are entitled to marshaling because there was a sufficient amount of non-inventory collateral from which Pre–Petition Lenders and DIP Lenders could satisfy their claims. Sixth, Vendors argue Debtors are attempting to assert rights, *viz* the rights of Pre–Petition and DIP Lenders, that they do not have under the Bankruptcy Code. Finally, Vendors argue Debtors' motion should be denied because it is procedurally defective, and that the relief Debtors seek requires an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

## II.  LEGAL ANALYSIS

■ According to the Supreme Court, an interpretation of the Bankruptcy Code, as with all statutes, begins with the statutory language itself. *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002). Where the statute is plain, "the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quotation omitted). The plain meaning of legislation should be conclusive, except when "the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters[.]" *Id.* at 242, 109 S.Ct. 1026 (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982)); *see Koenig Sporting Goods, Inc. v. Morse*

Road Co. (*In re Koenig Sporting Goods, Inc.*), 203 F.3d 986, 988 (6th Cir.2000) (stating "[i]f the statutory language is unambiguous, in the absence of a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive") (quotation omitted). Accordingly, this Court's analysis must begin with the language of 11 U.S.C. § 546(c).

### A. Section 546(c) and Section 2–702

■■■ Section 546(c) of the Bankruptcy Code preserves a seller's right to reclaim goods under state law upon discovery of a debtor's insolvency. Section 546(c) provides:

> Except as provided in subsection (d) of this section, the rights and powers of a trustee under sections 544(a), 545, 547, and 549 of this title are subject to any statutory or common-law right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, but—
>
> (1) such a seller may not reclaim any such goods unless such seller demands in writing reclamation of such goods—
>
> > (A) before 10 days after receipt of such goods by the debtor; or
> >
> > (B) if such 10–day period expires after the commencement of the case, before 20 days after receipt of such goods by the debtor; and
>
> (2) the court may deny reclamation to a seller with such a right of reclamation that has made such a demand only if the court—
>
> > (A) grants the claim of such a seller priority as a claim of a kind specified in section 503(b) of this title [an administrative expense priority]; or
> >
> > (B) secures such claim by a lien.

11 U.S.C. § 546(c). Thus, in order to establish a right to reclaim goods from a debtor pursuant to § 546(c), a reclaiming seller must establish: (1) a statutory or common law right to reclaim the goods; (2) the goods were sold in the ordinary course of business; (3) the debtor's insolvency when it received the goods; (4) a written reclamation demand made within 10 days after debtor's receipt of the goods and (5) debtor's possession of the goods at the time the written reclamation demand was received. *See McLouth Steel Prods. Corp. v. Quaker Chem. Co. (In re McLouth Steel Prods. Corp.)*, 213 B.R. 978, 984 (Bankr.E.D.Mich.1997); 5 LAWRENCE P. KING ET AL., COLLIER ON BANKRUPTCY ¶ 546.04 (15th ed.2003). Accordingly, Vendors must first establish a statutory or common law right to reclaim the goods. *See Pester Ref. Co. v. Ethyl Corp. (In re Pester Ref. Co.)*, 964 F.2d 842, 847 (8th Cir.1992); *Galey & Lord Inc. v. Arley Corp. (In re Arlco, Inc.)*, 239 B.R. 261, 266 (Bankr.S.D.N.Y.1999); *Mitsubishi Consumer Elecs. Am., Inc. v. Steinberg's, Inc. (In re Steinberg's, Inc.)*, 226 B.R. 8, 10 (Bankr.S.D.Ohio 1998); *In re Victory Mkts. Inc.*, 212 B.R. 738, 741 (Bankr. N.D.N.Y.1997).

■■■ Virtually every state grants a seller the right to reclaim the goods it ships to an insolvent buyer under its version § 2–702 of the Uniform Commercial Code. Under § 2–702 of the Uniform Commercial Code:

> (A) Where the seller discovers the buyer to be insolvent he may refuse delivery except for cash including payment for all goods theretofore delivered under the contract, and stop delivery under section 1302.79 of the Revised Code [§ 2–705 of the Uniform Commercial Code].
>
> (B) Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon

demand made within ten days after the receipt, but if misrepresentation of solvency has been made to the particular seller in writing within three months before delivery the ten day limitation does not apply. Except as provided in this division the seller may not base a right to reclaim goods on the buyer's fraudulent or innocent misrepresentation of solvency or of intent to pay. (C) The seller's right to reclaim under division (B) of this section is subject to the rights of a buyer in ordinary course or other good faith purchaser or lien creditor under section 1302.44 of the Revised Code [§ 2–403 of the Uniform Commercial Code]. Successful reclamation of goods excludes all other remedies with respect to them.

OHIO REV. CODE ANN. § 1302.76 (Anderson 2002). Thus, under § 2–702 of the Uniform Commercial Code the seller must demonstrate that (1) the buyer received the goods while insolvent and (2) demand was made within 10 days after receipt, provided misrepresentation of solvency was not made in writing within three months before delivery. The remedy available to a seller that discovers the buyer has received goods on credit while insolvent is grounded in the theory that the reclaiming seller has been defrauded by the insolvent buyer's implicit representations of solvency. See Pester Ref. Co., 964 F.2d at 844.

Numerous Vendors whose rights would be affected if Debtors' motion was granted have established a right to reclaim their goods under state law and have complied with the procedural requirements set forth in § 546(c)(1). It cannot seriously be argued that Debtors were solvent when they received the subject goods. Numerous Vendors diligently asserted their rights of reclamation by filing within the 10–day period a written reclamation demand.

Moreover, Debtors were in possession of the subject goods at the time such written demands were received and the goods were sold in the ordinary course of business. Vendors also complied with the Reclamation Procedures Order proposed by Debtors and entered by this Court.

Accordingly, Debtors seek to relegate to the status of general unsecured claim the claims of Vendors who properly asserted valid Reclamation Demands in accordance with state law, the Code and this Court's Reclamation Procedures Order. Debtors assert the Reclamation Procedures Order gives Debtors the right to so affect Vendors' claims because the Reclamation Procedures Order gives Debtors the right to "commence further proceedings to determine the extent to which the Reclamation Claim Amounts are subject to further defenses by reason of the liens granted to the Debtors' secured creditors." (Reclamation Procedures Order 3, Jan. 9, 2002, Doc. No. 383.) Thus, Debtors ask this Court to consider whether Vendors' reclamation claims were extinguished or are without value on account of the liens granted to Debtors' secured creditors.

### B. Reclamation Rights Subject to Rights of Good Faith Purchaser

Section 2–702(C) of the Uniform Commercial Code provides that a seller's right to reclaim is "subject to" the rights of a buyer in the ordinary course or a good faith purchaser. OHIO REV. CODE ANN. § 1302.76(C); see Pester Ref. Co., 964 F.2d at 844. It is well established that a secured creditor qualifies as a good faith purchaser for purposes of § 2–702(C). Allegiance Healthcare Corp. v. Primary Health Sys., Inc. (In re Primary Health Sys., Inc.), 258 B.R. 111, 114 (Bankr.D.Del. 2001); Steinberg's, Inc., 226 B.R. at 10; In re Marko Elecs., Inc., 145 B.R. 25, 28 (Bankr.N.D.Ohio 1992); Ohio Farmers

Grain & Supply Ass'n v. Melvin Liquid Fertilizer Co., Inc. (In re Melvin Liquid Fertilizer Co., Inc.), 37 B.R. 587, 589 (Bankr.S.D.Ohio 1984); *U.S. Billiards Co., Inc. v. Greenberger (In re Bensar Co.)*, 36 B.R. 699, 703 (Bankr.S.D.Ohio 1984); *Action Indus., Inc. v. Dixie Enters., Inc. (In re Dixie Enters., Inc.)*, 22 B.R. 855, 859 (Bankr.S.D.Ohio 1982). It is also well established that a seller's right to reclaim is "subject to" the existing interest of a secured creditor, meaning the right to reclaim is subordinate to the interest of a secured creditor and not automatically extinguished by such interest. *Pester Ref. Co.*, 964 F.2d at 846; *United States v. Westside Bank*, 732 F.2d 1258, 1262 (5th Cir.1984); *Bindley W. Indus. v. Reliable Drug Stores, Inc. (In re Reliable Drug Stores, Inc.)*, 181 B.R. 374, 377 (S.D.Ind. 1995); *Isaly Klondike Co. v. Sunstate Dairy & Food Prods. Co. (In re Sunstate Dairy & Food Prods. Co.)*, 145 B.R. 341, 345 (Bankr.M.D.Fla.1992); *In re Roberts Hardware Co.*, 103 B.R. 396, 398 (Bankr. N.D.N.Y.1988); *Am. Saw & Mfg. Co. v. Bosler Supply Group (In re Bosler Supply Group)*, 74 B.R. 250, 253 (N.D.Ill.1987); *W. Farmers Ass'n v. Ciba Geigy (In re W. Farmers Ass'n)*, 6 B.R. 432, 436 (Bankr. W.D.Wash.1980).

▆▆▆▆ While the interpretation of the "subject to" language in § 2–702(C) of the Uniform Commercial Code has gained widespread acceptance, there is a split of authority over whether a reclaiming seller whose rights are subordinate to the interest of a secured creditor is automatically entitled to an administrative expense priority or a replacement lien equal to the full value of the claim. Some courts have found where reclamation is denied, the plain language of § 546(c) entitles the reclaiming seller to an administrative expense priority or lien in the full amount of the reclamation claim, regardless the existence of the goods or proceeds or whether the secured creditor is over or under-secured. *See Sunstate Dairy & Food Prods. Co.*, 145 B.R. at 345–46; *Bosler Supply Group*, 74 B.R. at 254; *see also Marko Elecs., Inc.*, 145 B.R. at 28–29; *Melvin Liquid Fertilizer Co., Inc.*, 37 B.R. at 590; *Harris Trust & Savs. Bank v. Wathen's Elevators, Inc. (In re Wathen's Elevators, Inc.)*, 32 B.R. 912, 923 (Bankr.W.D.Ky. 1983).

The position of these courts is not lacking in textual support. The plain language of § 546(c) states that "the court may deny reclamation to a seller with such a right of reclamation ... only if the court grants the claim of such a seller priority as a claim of a kind specified in section 503(b) of this title or secures such claim by a lien." 11 U.S.C. § 546(c). As previously stated, even when a secured creditor possesses an interest in all of a debtor's inventory, the reclaiming seller still has "a right of reclamation." *Id.* While the seller's right of reclamation is "subject to" or junior to the prior claim of the secured creditor, the seller's right of reclamation still exists. OHIO REV. CODE ANN. § 1302.76(C). Accordingly, Vendors argue a seller that has successfully demonstrated a right to reclamation under federal and state law is entitled to either an administrative priority or a replacement lien even if the prior secured creditor is under-secured or the goods subject to the reclamation demand are sold in satisfaction of the secured creditor's claim. Vendors argue that under the plain language of § 546(c) the existence of proceeds or the actual disposition of the goods after the petition date is not relevant.

The problem with this interpretation of § 546(c) is that it is contrary to the expressed intentions of the legislature. The legislative history behind the enactment of § 546(c) reflects Congress' intention to

"recognize, in part, the validity of section 2–702 of the Uniform Commercial Code ...." H.R. REP. No. 95–595, at 372 (1977); S. REP. No. 95–989, at 86–87 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5963, 6328, 5787, 5873. Vendors' interpretation of § 546(c) would give reclaiming sellers something they do not have under § 2–702 of the Uniform Commercial Code—a priority interest in the buyer's assets other than the goods to be reclaimed. *Pester Ref. Co.*, 964 F.2d at 847 (citing *Dixie Enters., Inc.*, 22 B.R. at 860); *Steinberg's, Inc.*, 226 B.R. at 12; *see also Sandoz Pharms. Corp. v. Blinn Wholesale Drug Co., Inc. (In re Blinn Wholesale Drug Co., Inc.)*, 164 B.R. 440, 447 (Bankr. E.D.N.Y.1994); *Toshiba Am., Inc. v. Video King of Ill., Inc. (In re Video King of Ill., Inc.)*, 100 B.R. 1008, 1016 (Bankr.N.D.Ill. 1989). Absent congressional action, it would be inappropriate to analyze Vendors' interests differently simply because Debtors are involved in bankruptcy proceedings. *See Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

Under the Uniform Commercial Code, if an under-secured creditor forecloses on the goods to be reclaimed and uses the entire proceeds to pay down its secured debt, the seller's reclamation right is rendered valueless. *Arlco, Inc.*, 239 B.R. at 273 (citing *Pester Ref. Co.*, 964 F.2d at 847); *Victory Mkts., Inc.*, 212 B.R. at 743 ("If the seller's right to reclaim is worthless because the superior secured creditor's claim exceeds the value of the goods, the seller's request to reclaim is not denied by the court but rather is of no value, and therefore the remedies of an administrative priority claim or lien under Code § 546(c) are unavailable to the seller."); *Blinn Wholesale Drug Co., Inc.*, 164 B.R. at 448 ("If the seller cannot credibly show that its right of reclamation is other than valueless, reclamation may be denied and

the seller may be granted a secured or administrative priority claim of nominal or no value" (footnote omitted).); *Video King of Ill., Inc.*, 100 B.R. at 1017 ("If ... the reclamation rights of [Vendors] would be valueless outside of bankruptcy because the goods in question for whatever reason would go first to satisfy the Bank's claim, those rights are equally valueless in the bankruptcy context, and the claimants would be entitled to no administrative claim or lien for the denial of the chance to exercise this valueless right.").

Even if the buyer of the subject goods had additional assets, the reclaiming seller would have no priority interest with respect to such additional assets. The legislative history and the plain language of § 546(c) do not suggest that Congress intended to expand the state law rights of reclaiming sellers at the expense of unsecured creditors in bankruptcy. Rather, the legislative history reflects Congress' intention to recognize the validity of the state law rights of reclaiming sellers. The right to an administrative priority or a replacement lien under § 546(c) is in lieu of, and not in addition to, a seller's right to reclaim. *See Collingwood Grain, Inc. v. Coast Trading Co., Inc. (In re Coast Trading Co., Inc.)*, 744 F.2d 686, 692 (9th Cir. 1984).

Accordingly, this Court rejects the position that where reclamation is denied, the reclamation seller is automatically entitled to an administrative priority claim or a replacement lien in the full amount of the reclamation claim. While the mere presence of a secured creditor with superior rights under § 2–702(C) does not extinguish the rights of a reclaiming seller, consideration must nevertheless be given to the secured creditor's interest in determining the value of the rights of a reclaiming seller. In priority terms, the reclaiming seller stands behind the insolvent

buyer's secured creditors who have security interests in the goods subject to reclamation demands. Accordingly, if the buyer's secured creditor releases its security interest in the goods to be reclaimed, the seller may enforce its right to reclaim. In the bankruptcy context, the secured creditor's decision determines the value of the seller's right to reclaim. *Pester Ref. Co.,* 964 F.2d at 847.

■■■■■ In the case *sub judice,* the secured creditor's decisions are favorable to Vendors. Pre–Petition Lenders were paid in full through the Interim and Final DIP Orders from the DIP Facility and not from the sale of the subject goods. On the petition date Pre–Petition Lenders were over-secured. Under the Interim and Final DIP Orders, Debtors were authorized to, and did in fact, repay all obligations owed to Pre–Petition Lenders. Upon receipt of these funds any liens granted in favor of Pre–Petition Lenders securing the pre-petition obligations were released. The Court rejects Debtors' claim that the pre-petition liens were preserved to DIP Lenders. The Interim and Final DIP Orders did not transfer the pre-petition liens that secured the obligations arising under the Pre–Petition Credit Agreement from Pre–Petition Lenders to the lenders under the DIP Facility.[7] Rather, the Interim and Final DIP Orders gave Debtors the authority to grant DIP Lenders new liens, and gave DIP Lenders a super-priority claim. Since Pre–Petition Lenders' liens were released, Vendors' right to reclaim is not affected by the interests of Pre–Petition Lenders.

Debtors maintain that all of the goods that were subject to Vendors' Reclamation Demands were sold during the "going-out-of-business" sales, and the proceeds thereof were applied to repay Debtors' obligations under the DIP Facility. No action on the part of a debtor should be permitted to defeat a seller's right to reclamation. *Griffin Retreading Co. v. Oliver Rubber Co. (In re Griffin Retreading Co.),* 795 F.2d 676, 679 (8th Cir.1986) (citing *W. Farmers Ass'n,* 6 B.R. at 432); *see also McLouth Steel Prod. Corp.,* 213 B.R. at 989–90; *Video King Of Ill., Inc.,* 100 B.R. at 1014. A debtor's decision to grant a security interest in inventory to a *subsequent* secured lender cannot defeat a seller's reclamation rights if the seller asserted its rights before the security interest is granted. Moreover, the Interim and Final DIP Orders explicitly prohibit Debtors from returning the goods constituting collateral under § 546(c) of the Bankruptcy Code. Therefore, having notice of the Reclamation Demands, DIP Lenders cannot qualify as good faith purchasers under § 2–702(C).

## CONCLUSION

Debtors seek to relegate to unsecured status the claims of numerous Vendors that have asserted valid reclamation claims pursuant to § 546(c) of the Bankruptcy Code and § 2–702 of the Uniform Commercial Code. Having complied with these statutory provisions, these Vendors had reclamation claims that were subject to and not extinguished by the prior security interest of Pre–Petition Lenders. When a seller's right of reclamation is subject to the interest of a prior secured creditor, the value of that seller's claim depends on the actual disposition of the subject goods. Pre–Petition Lenders chose to release their security interests and were paid in full through the Interim and Final DIP Orders by the DIP Facility. Thus, the value of the Vendors' reclamation claims is

---

7. This fact distinguishes this case from this Court's prior order confirming non-priority status of reclamation claims in the Wheeling– Pittsburgh bankruptcy. *In re Pittsburgh–Canfield Corp.,* Case No. 00–43394 (Bankr. N.D.Ohio March 13, 2003).

not affected by the interests of Pre–Petition Lenders.

DIP Lenders were granted new liens and super-priority status. They did not assume the liens that secured the obligations arising under the pre-petition loans. Even if the goods that were subject to the Vendors' Reclamation Demands were sold and the proceeds thereof were applied to the DIP Facility, a debtor's decision to grant a security interest in inventory to a subsequent secured lender cannot defeat a seller's reclamation rights. Vendors properly asserted valid Reclamation Demands in accordance with state law, the Code and this Court's Reclamation Procedures Order. This Court rejects Debtors' contention that Vendors' reclamation claims have been rendered worthless and are not entitled to priority. Accordingly, this Court does not find it necessary to address the additional arguments presented by Vendors as to why Debtors' motion should be overruled at this time. For the reasons stated herein, Debtors' motion for entry of an order determining reclamation claims to be general unsecured claims and objection to allowance of such claims as entitled to priority is overruled.