374 F.3d 1087
 CANDLE CORPORATION OF AMERICA, Plaintiff-Appellant, and
Blyth, Inc., Plaintiff,
v.
UNITED STATES INTERNATIONAL TRADE COMMISSION and Deanna Tanner Okun, Chairman, United States International Trade Commission, Defendants, and
United States Bureau of Customs and Border Protection and Robert C. Bonner, Commissioner, United States Bureau of Customs and Border Protection, Defendants-Appellees, and
Candle-Lite Division of Lancaster Colony Corporation, Lumi-Lite Candle Co., and General Wax & Candle Co., Defendants-Appellees, and
Muench-Kreuzer Candle Company, Defendant-Appellee.
 No. 03-1348.
 United States Court of Appeals, Federal Circuit.
 DECIDED: July 2, 2004.
 
 David A. Wilson, Hale and Dorr LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief was Joshua A. Davenport.
 Paul D. Kovac, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendants-appellees, United States Bureau of Customs and Border Protection, et al. With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director and Jeanne E. Davidson, Deputy Director. Of counsel on the brief was Ellen C. Daly, Senior Attorney, Office of Chief Counsel, United States Bureau of Customs and Border Protection, of Washington, DC. Of counsel was Lucius B. Lau.
 Eric P. Salonen, Stewart and Stewart, of Washington, DC, argued of defendants-appellees, Candle-lite Division of Lancaster Colony Corporation, et al. With him on the brief were Terence P. Stewart and Patrick J. McDonough.
 Gregory C. Dorris, Pepper Hamilton LLP, of Washington, DC, argued for defendant-appellee, Muench-Kreuzer Candle Company. With him on the brief was Edward M. Andries.
 Before MICHEL, GAJARSA, and DYK, Circuit Judges.
 Opinion for the court filed by Circuit Judge DYK. Dissenting opinion filed by Circuit Judge GAJARSA.
 DYK, Circuit Judge.
 
 
 1
 This case involves a proceeding pursuant to the Continued Dumping and Subsidy Offset Act of 2000, Pub. L. No. 106-387, § 1(a), 114 Stat. 1549, 1549A-73 (codified at 19 U.S.C. § 1675c (2000)) ("CDSOA" or "Byrd Amendment"), which entitled "affected domestic producers" to recover antidumping duties imposed on foreign producers. 19 U.S.C. § 1675c(a). The United States Bureau of Customs and Border Protection ("Customs") denied the requests by Candle Corporation of America ("CCA") for offset distributions pursuant to the Byrd Amendment for fiscal years 2001 and 2002. CCA sought review of these decisions in the United States Court of International Trade, which granted judgment in the government's favor on the ground that CCA (either on its own behalf or on behalf of the entities it acquired) cannot qualify to receive offset distributions because it did not support the petition that led to the imposition of antidumping duties. Candle Corp. of Am. v. United States Int'l Trade Comm'n, 259 F.Supp.2d 1349, 1356 (Ct. Int'l Trade 2003). We affirm, although we do so on a somewhat different theory than that of the Court of International Trade.
 
 BACKGROUND
 
 2
 Stripped of irrelevancies, the background may be simply stated. On September 3, 1985, the National Candle Association, an organization of domestic candle makers, filed a petition for an antidumping investigation of petroleum wax candles from the People's Republic of China. Among other entities, Lenox Candles ("Lenox") and Colonial Candles of Cape Cod ("Cape Cod") supported the petition. Appellant CCA did not, although it was listed among "OTHER U.S. CANDLE MANUFACTURERS" in the petition. In response to the first of two separate questionnaires from the United States International Trade Commission ("ITC"), CCA declined to support the petition because CCA imported the dumped candles and, therefore, tariffs would adversely affect its income. In response to the second questionnaire, CCA opposed the petition. The ITC ultimately published an antidumping order on August 28, 1986, and antidumping duties were collected. Antidumping Duty Order: Petroleum Wax Candles From the People's Republic of China, 51 Fed. Reg. 30,686 (Aug. 28, 1986).
 
 
 3
 The Byrd Amendment requires that duties assessed pursuant to an antidumping duty order be distributed in offset distributions to affected domestic producers[1] for their qualifying expenditures.[2] 19 U.S.C. § 1675c(a). The ITC prepares a list of affected domestic producers, which it forwards to Customs. See id. § 1675c(d)(1). The affected domestic producers must certify that they desire and are entitled to a distribution, and they must disclose their qualifying expenditures. See id. § 1675c(d)(2). Customs then distributes the funds among the affected domestic producers on a pro rata basis. See id. § 1675c(d)(3). In addition, Customs regulations provide that successor companies to affected domestic producers may receive any offset distributions to which the predecessor company is entitled. 19 C.F.R. § 159.61(b)(1)(i) (2003).[3] Pursuant to the Byrd Amendment, Customs had available $18,317,982.28 of offset distributions for the petroleum wax candle antidumping order for fiscal year 2001, CDSOA FY2001 Disbursements FINAL, available at http://www.customs.ustreas.gov/xp/cgov/import/add_ cvd/cont_dump/cdsoa_01/, and had available $69,536,243.70 for fiscal year 2002, CDSOA FY2002 Disbursements FINAL, available at http://www.customs.ustreas.gov/xp/cgov/import/add_ cvd/cont_dump/cdsoa_02/.
 
 
 4
 After the entry of the antidumping order, CCA acquired substantially all of the assets of Lenox and Cape Cod (which had supported the petition) through separate asset purchase agreements in 1987 and 1990, respectively. In 2001 CCA sought a Byrd Amendment offset distribution on behalf of Lenox and Cape Cod. However, Customs denied CCA's claim, stating that CCA did not qualify for an offset distribution either as an affected domestic producer or as a successor company to Lenox and Cape Cod. CCA again sought a Byrd Amendment offset distribution in 2002, which Customs denied.
 
 
 5
 On November 27, 2002, CCA filed a complaint in the Court of International Trade seeking review pursuant to 28 U.S.C. § 1581(i) of Customs' denial of offset distributions, arguing that it qualified as an affected domestic producer both in its own right and as a successor company to Lenox and Cape Cod. On April 8, 2003, the Court of International Trade denied CCA's motion for summary judgment and granted judgment in favor of the government. Candle Corp., 259 F.Supp.2d at 1350. First, the court held that CCA did not qualify as an "affected domestic producer" because it had not supported the petition for the antidumping investigation. Id. at 1354. Second, it held that CCA did not qualify as a "successor company" to Lenox and Cape Cod pursuant to the Byrd Amendment because CCA had not supported the petition. Id. at 1356. Third, the court refused to consider CCA's argument that it was entitled to claim on behalf of Lenox and Cape Cod on the theory that they allegedly "remain[] in operation" because CCA raised the argument for the first time in its reply brief. Id. at 1357.
 
 
 6
 CCA appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).
 
 DISCUSSION
 
 7
 In reviewing decisions by the Court of International Trade in actions pursuant to 28 U.S.C. § 1581(i), we "apply the standard of review set forth in 5 U.S.C. § 706." Consol. Bearings Co. v. United States, 348 F.3d 997, 1004 (Fed.Cir.2003). Accordingly, we will set aside Customs' denial of offset distributions only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000).
 
 
 8
 * The central question before us is whether a company that opposed an antidumping investigation can recover Byrd Amendment offset distributions by acquiring businesses that would have been entitled to such distributions. The pertinent statutory language is:
 
 
 9
 Duties assessed pursuant to a countervailing duty order, an antidumping duty order, or a finding under the Antidumping Act of 1921 shall be distributed on an annual basis under this section to the affected domestic producers for qualifying expenditures. Such distribution shall be known as the "continued dumping and subsidy offset". [sic]
 
 
 10
 19 U.S.C. § 1675c(a). The statute defines the term "affected domestic producer" as:
 
 
 11
 any manufacturer, producer, farmer, rancher, or worker representative (including associations of such persons) that —
 
 
 12
 (A) was a petitioner or interested party in support of the petition with respect to which an antidumping duty order, a finding under the Antidumping Act of 1921, or a countervailing duty order has been entered, and
 
 
 13
 (B) remains in operation.
 
 
 14
 
 Companies, businesses, or persons that have ceased the production of the product covered by the order or finding or who have been acquired by a company or business that is related to a company that opposed the investigation shall not be an affected domestic producer.
 
 
 
 15
 Id. § 1675c(b)(1) (emphasis added).
 
 
 16
 Three things are clear. First, as CCA admits, CCA itself does not qualify as an "affected domestic producer." Second, Lenox and Cape Cod qualify as "affected domestic producers" if they "remain[] in operation," unless disqualified by the last sentence of 1675c(b)(1). Third, Customs' regulation allows CCA as the acquiring company to claim on behalf of Lenox and Cape Cod. It states:
 
 
 17
 In the case of a company that has succeeded to the operations of a predecessor company that appeared on the [ITC list of potential affected domestic producers], the successor company may file a certification to claim an offset as an affected domestic producer on behalf of the predecessor company. In its certification, the company must name the predecessor company to which it has succeeded and it must describe in detail the duly authorized succession by which it is entitled to file the certification.
 
 
 18
 19 C.F.R. § 159.61(b)(1)(i). That regulation seems to us permissible under the statute, which authorizes Customs to spell out procedures for claims under the statute.[4] The sole question, therefore, is whether the last sentence of section 1675c(b)(1) disqualifies Lenox and Cape Cod from being affected domestic producers.
 
 
 19
 Under that provision, otherwise qualified acquired entities are disqualified only if they "have been acquired by a company or business that is related to a company that opposed the investigation." 19 U.S.C. § 1675c(b)(1). The statute in this respect is hardly a model of clarity, and there are two possible interpretations. First, the statute could mean that, whether the acquirer was a "company" or a "business," it must not have been "related to a company that opposed the investigation." In other words, the "related to" language applies to both the word "company" and the word "business." Under this interpretation, since a company cannot "be related to itself," Barnhart v. Sigmon Coal Co., 534 U.S. 438, 456, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002), CCA is not related to the "company that opposed the investigation." CCA urges that this result follows from Barnhart. In Barnhart, the pertinent statute required the Commissioner of Social Security to assign coal industry retirees "to a signatory operator which (or any related person with respect to which) remains in business." Id. at 450, 122 S.Ct. 941 (quoting 26 U.S.C. § 9706(a) (1974)). The signatory operator was no longer in business, but the statute also applied to "related person[s]." The issue was whether a successor in interest to the signatory operator was a "related person" to the signatory operator. The Court concluded that, under the statutory definition of "related person," the successor in interest could be a related person only if the signatory operator was itself a related person. Id. at 456, 122 S.Ct. 941. The Court declined to include the signatory operator within the meaning of "related person" on the theory that "the signatory operator would be related to itself" and that the statute "necessarily implies that a `related person' is a separate entity from a signatory operator." Id.
 
 
 20
 The second interpretation is that the statute should be read to establish two separate categories: (1) entities "acquired by a company ... that opposed the investigation" and (2) entities "acquired by a ... business that is related to a company that opposed the investigation." In this interpretation, the "related to" language only qualifies the word "business." Thus, the provision bars claims on behalf of a company that was acquired by a company that opposed the investigation or, broadly, a company acquired by any "business" related to such a company. Under this interpretation, Congress appeared to use the term "company" to mean the acquiring entity, whether or not it was incorporated,[5] and the word "business" broadly to include related entities. This broad interpretation of the term "company" is supported by the fact that the last sentence of section 1675c(b)(1) (under either interpretation) is concerned only with a "company" (and not a business) that opposed the investigation.
 
 
 21
 On its face, we think the statutory language compels neither interpretation.[6] However, contrary to the dissent, Diss. Op., post at 1095-97, this does not lead us immediately to step two of the Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), analysis, that is, consideration of an agency interpretation. Rather, we must first use all "traditional tools of statutory construction" to determine whether "Congress had an intention on the precise question at issue" before we consider deference to an agency interpretation. Id. at 843 n. 9, 104 S.Ct. 2778. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. 2778; see also Chem. Mfrs. Ass'n v. Natural Res. Def. Council, Inc., 470 U.S. 116, 125, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985) ("[I]f Congress has clearly expressed an intent contrary to that of the Agency, our duty is to enforce the will of Congress.").
 
 
 22
 This case is unlike Barnhart, where the statutory language was "clear and unambiguous." 534 U.S. at 460, 122 S.Ct. 941. All parties here agree that there is no legislative history that helps to resolve the ambiguity in the statutory language. Thus, we must look beyond the statutory language to the statute's purpose to determine its meaning. See, e.g., Holloway v. United States, 526 U.S. 1, 9, 119 S.Ct. 966, 143 L.Ed.2d 1 (1999) (noting that "statutory language should be interpreted consonant with `the provisions of the whole law, and ... its object and policy'" (quoting John Hancock Mut. Life Ins. Co. v. Harris Trust and Sav. Bank, 510 U.S. 86, 94-95, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993))); Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 608, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979) ("As in all cases of statutory construction, our task is to interpret the words of these statutes in light of the purposes Congress sought to serve."); Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1355 (Fed.Cir.2003) ("When interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute (or statutes on the same subject) and the objects and policy of the law, as indicated by its various provisions, and give it such a construction as will carry into execution the will of the Legislature." (quoting Kokoszka v. Belford, 417 U.S. 642, 650, 94 S.Ct. 2431, 41 L.Ed.2d 374 (1974))); see also Johnson v. United States, 529 U.S. 694, 710 n. 10, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) ("Our obligation is to give effect to congressional purpose so long as the congressional language does not itself bar that result."). Indeed, the Supreme Court has recently and unanimously held that, where textual ambiguity exists, "we must look beyond the bare text ... to the context in which it was enacted and the purposes it was designed to accomplish." Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 124 S.Ct. 1836, 1842, ___ L.Ed.2d ___ (2004).
 
 
 23
 The purpose of the statute is quite clear — to bar opposers of antidumping investigations from securing payments either directly or through the acquisition of supporting parties. See 19 U.S.C. § 1675c(b)(1)(A) (requiring that an "affected domestic producer" be "a petitioner or interested party in support of the petition with respect to which an antidumping order ... has been entered"). That purpose can be accomplished only by adopting the second of the two interpretations. At the same time, the appellants have been unable to identify any plausible purpose to be served by the first interpretation. (See Opening Br. for Appellant at 23 n. 14 ("[T]he purpose of disqualifying entities related to opposing parties, but not the opposing parties themselves, in the CDSOA may not be readily apparent.").) That is, the appellants have identified — and we can discern — no reason why Congress would wish to bar recovery when the otherwise qualifying entity was acquired by a party related to an opposer but to permit it when the acquisition was made by the opposer directly. Cf. F. Hoffman-La Roche Ltd. v. Empagran S.A., ___ U.S. ___, 124 S.Ct. 2359, 2367, 159 L.Ed.2d 226 (2004) (refusing to construe the Sherman Act to encompass "conduct that is significantly foreign" because "[w]e can find no convincing justification for the extension").
 
 
 24
 Contrary to the dissent's suggestion, we are not interpreting the statute without the benefit of Customs' views. See Diss. Op., post at 1097. Customs addressed the question of statutory interpretation and reached the same interpretation as we do, albeit reaching that result by a somewhat different route:
 
 
 25
 The plain language of the statute clearly evidences a Congressional intent to prevent a company, business or person who opposed an antidumping or countervailing duty investigation from obtaining benefits under the CDSOA. The express language disqualifying even a company related to a company opposing an investigation serves to make clear that Congressional intent.
 
 
 26
 (J.A. at 286 (emphasis added); see also J.A. at 308 ("Customs maintains the view that Congress did not intend CDSOA distributions to be made to any company that opposed the investigation.").) Thus, we are upholding Customs' interpretation of the statute even though we do so as a matter of statutory interpretation, rather than Chevron deference.
 
 
 27
 Accordingly, we construe the statute as barring claims on behalf of otherwise affected domestic producers if those producers were acquired by a company that opposed the investigation or were acquired by a business related to a company that opposed the investigation. This barrier exists whether the claim is made by the acquiring company on behalf of the acquired entities or by the acquired entities themselves. Thus, neither CCA nor the entities it acquired (Lenox and Cape Cod) are entitled to receive payments.
 
 CONCLUSION
 
 28
 For the foregoing reasons, we affirm the decision of the Court of International Trade.
 
 
 29
 
 AFFIRMED.
 
 
 COSTS
 
 30
 No costs.
 
 
 
 Notes:
 
 
 [1]
 The Byrd Amendment provides:
 The term "affected domestic producer" means any manufacturer, producer, farmer, rancher, or worker representative (including associations of such persons) that —
 (A) was a petitioner or interested party in support of the petition with respect to which an antidumping duty order, a finding under the Antidumping Act of 1921, or a countervailing duty order has been entered, and
 (B) remains in operation.
 Companies, businesses, or persons that have ceased the production of the product covered by the order or finding or who have been acquired by a company or business that is related to a company that opposed the investigation shall not be an affected domestic producer.
 19 U.S.C. § 1675c(b)(1).
 
 
 [2]
 The statute provides:
 The term "qualifying expenditure" means an expenditure incurred after the issuance of the antidumping duty finding or order or countervailing duty order in any of the following categories:
 (A) Manufacturing facilities.
 (B) Equipment.
 (C) Research and development.
 (D) Personnel training.
 (E) Acquisition of technology.
 (F) Health care benefits to employees paid for by the employer.
 (G) Pension benefits to employees paid for by the employer.
 (H) Environmental equipment, training, or technology.
 (I) Acquisition of raw materials and other inputs.
 (J) Working capital or other funds needed to maintain production.
 19 U.S.C. § 1675c(b)(4).
 
 
 [3]
 The regulation provides:
 In the case of a company that has succeeded to the operations of a predecessor company that appeared on the [ITC list of affected domestic producers], the successor company may file a certification to claim an offset as an affected domestic producer on behalf of the predecessor company. In its certification, the company must name the predecessor company to which it has succeeded and it must describe in detail the duly authorized succession by which it is entitled to file the certification.
 
 
 [19]
 C.F.R. § 159.61(b)(1)(i)
 
 
 [4]
 The statute provides: "The Commissioner [of Customs] shall prescribe procedures for distribution of the continued dumping or subsidies offset required by this section. Such distribution shall be made not later than 60 days after the first day of a fiscal year from duties assessed during the preceding fiscal year." 19 U.S.C. § 1675c(c)
 
 
 [5]
 The term "company" may be used to mean "a corporation, partnership, association, joint-stock company, trust, fund, or organized group of persons,whether incorporated or not." Black's Law Dictionary 274 (7th ed. 1999) (emphasis added).
 
 
 [6]
 Contrary to the appellant's argument, the rules of grammar do not require the use of an article or a comma before the word "business" for the second interpretation to be correct. While the drafters' intent to adopt the second interpretation certainly would have been clear if an article or comma had been used,see Gordon Loberger & Kate Shoup Welsh, Webster's New World English Grammar Handbook 106, 160 (2002), the lack of an article or comma simply makes the clause ambiguous. It does not compel the first interpretation. Similarly, the inclusion of "or business" after the phrase "related to a company" in section 1675c(b)(1) would have supported the first interpretation.
 GAJARSA, Circuit Judge, dissenting.
 The majority concludes that the statutory language at issue here, 19 U.S.C. § 1675c (the "Byrd Amendment"), is ambiguous. Although I agree with the majority's conclusion regarding the ambiguity of the statutory language, because I do not agree with the majority's disposition in light of that conclusion, I respectfully dissent.
 Section 1675c(b)(1) states that "[c]ompanies, businesses, or persons that have ceased the production of the product covered by the order or finding or who have been acquired by a company or business that is related to a company that opposed the investigation shall not be an affected domestic producer" (emphasis added). The majority recites two possible readings of this provision. The first, advanced by Candle Corporation of America ("CCA"), applies the "related to a company that opposed the investigation" limitation to both "companies" and "businesses," with the result being that only companies and businesses that are related to a company that opposed the petition are excluded from affected domestic producer status. CCA's interpretation thus allows companies or businesses acquired by a company that itself opposed the petition — but is not related to a company or business that opposed the petition — to qualify as affected domestic producers. This interpretation allows CCA to be eligible to apply for an offset distribution.
 The second interpretation developed by the court and conceded at oral argument as not advanced in this appeal by any of the parties applies the "related to" language only to "businesses," thereby limiting the effect of the above-described statutory language. Under this reading, an acquiring "company ... that opposed the petition" — whether or not related to a company that opposed the petition — is excluded from affected domestic producer status, and accordingly may not receive a share of the offset distributions required by the Byrd Amendment. 19 U.S.C. § 1675c(a), (b)(1). Since CCA is a "company ... that opposed the petition," it falls within the exclusion. I agree with the majority that both of these readings might be permissible under the plain language of the statute, and that "the statutory language compels neither interpretation." See Maj. op. at 1093. I also agree that regulations promulgated by the United States Bureau of Customs and Border Protection ("Customs") do not adopt either reading of the statute.[1]
 Where I depart from the majority opinion is on my view of the proper disposition of this case given the statute's ambiguity. After concluding that the language of section 1675c(b)(1) is ambiguous and compels neither of the majority's proffered interpretations, the majority seeks out the statute's legislative policy and purpose to lay the foundation for its own interpretation, which it adopts, and affirms the decision of the Court of International Trade. My point of disagreement is a narrow one and stems from what I believe is the proper relationship between the courts and the administrative agencies that they review.
 When addressing an agency decision, we indulge "a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 740-41, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) (citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). Furthermore, "whether or not they enjoy any express delegation of authority on a particular question, agencies charged with applying a statute necessarily make all sorts of interpretive choices, and while not all of those choices bind judges to follow them, they certainly may influence courts facing questions the agencies have already answered." United States v. Mead Corp., 533 U.S. 218, 227, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). The majority decision disregards the scheme of deference dictated by these decisions and instead purports to decipher on its own the congressional policy and purpose, developing thereby an interpretation of the statute advanced by none of the parties before this court. The result is that the court imposes its own interpretation of section 1675c(b)(1) upon Customs without any possibility of future interpretation by the agency, despite the authority to resolve statutory ambiguities that has been delegated to Customs by Congress. See 19 U.S.C. § 1624 (2000) ("In addition to the specific powers conferred by this chapter the Secretary of the Treasury is authorized to make such rules and regulations as may be necessary to carry out the provisions of this chapter.").
 The government chose to defend Customs' decision in this court on the same reasoning applied by the agency in denying CCA's application for benefits. Customs denied the CCA's request on the basis that its "creatively restrictive reading of the statute" was nonetheless contrary to congressional intent. Customs did not rest its decision on any perceived ambiguity. It is this court that now finds the statutory language ambiguous and resolves the ambiguity without a clear legislative record or first affording the agency an opportunity to resolve the ambiguity itself.
 The majority states that it is only pursuing the first step of Chevron in that it is using all "traditional tools of statutory construction" to determine whether "Congress had an intention on the precise question at issue." As the majority plainly announces, the statutory language is ambiguous. To resolve this ambiguity, the majority penetrates the textual ambiguity and discerns a purpose from what it believes the statute was designed to accomplish. Unfortunately, it does not have any premise for such a determination. In my judgment, there is no basis to decipher the congressional intent or purpose from any source. There is no legislative history of the Byrd Amendment on which this court can rely to discern a purpose. Moreover, although the majority refers to a purpose in the statutory framework, it simply quotes the language of the statute defining an affected domestic producer, a category in which we all apparently agree that CCA does not fall. See Maj. op. at 1094. Despite the litany of cases cited by the majority describing a court's duty to "look beyond the bare text," when I do, I see only a lack of congressional intent. Furthermore, none of the cases cited by the majority occur in an administrative setting. See Maj. op. at 1093-94 (citing cases and quoting Jones v. R.R. Donnelley & Sons Co., ___ U.S. ___, 124 S.Ct. 1836, 1842, ___ L.Ed.2d ___ (2004)). Where an agency is involved, Chevron and its progeny are clear — ambiguities are to be resolved by first and foremost by the agency.
 The inability of the majority to identify any justification for CCA's reading of the statute does not create a clear congressional purpose favoring the majority's competing interpretation. Rather, it confirms that the statute is ambiguous. The majority's citation of F. Hoffman-La Roche Ltd. v. Empagran S.A., ___ U.S. ___, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004), is revealing of the fact that the majority is operating on the absence, rather than presence, of congressional intent. Maj. op. at 1094. The majority, however, overlooks an important predicate to the language that it quotes, which is that the Supreme Court was there relying on a canon of statutory construction to resolve an ambiguity and found no justification for deviating from that canon. F. Hoffman-La Roche, 124 S.Ct. at 2367. The majority here has no similar basis for preferring one interpretation over another, and resolves the ambiguity as it does simply because it finds no reason not to.
 Consequently, I would permit the agency to interpret the statute in the first instance. Customs relied on its regulation rather than the text of the Byrd Amendment in reaching its decision, both of which Customs admits are silent regarding the facts of this case. This court now affirms the decisions of Customs and the Court of International Trade on a "somewhat different theory" that coincides with the reasoning in neither forum. Maj. op. at 1089. This presents additional difficulties, as "[w]e are powerless to affirm an administrative action on a ground not relied upon by the agency." NEC Home Elecs. v. United States, 54 F.3d 736, 743 (Fed.Cir.1995) (citing Securities & Exch. Comm'n v. Chenery Corp., 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947)). I recognize that this court has sensibly acknowledged that "the Chenery doctrine is not applied inflexibly" and that "the doctrine does not require a remand to the agency if it is clear that the agency would have reached the same ultimate result had it considered the new ground." Fleshman v. West, 138 F.3d 1429, 1433 (Fed.Cir.1998) (quotations omitted).[2]
 Where, as here, however, the exception approved of in Fleshman eliminates an agency's discretion to interpret the statutes it is charged with administering, I would vacate the decision of the Court of International Trade and remand the matter to the agency to interpret the statute in the first instance. The majority here does not simply uphold the decision of Customs, but rather discerns the purpose of section 1675c(b)(1) by its own accord. Customs' outcome, therefore, is not simply permissible — it is now and forever will be mandated by the court's action, which removes the necessary flexibility of policy interpretation that the agency may require in resolving the ambiguity. Courts should not take it upon themselves to usurp the administrative agency of its delegated authority as the agency is in a better position than this court to cognoscere causas and set the appropriate policy directive. I therefore respectfully dissent.
 Notes:
 
 
 [1]
 Customs also agrees that neither the Byrd Amendment nor its regulations address the situation before the courtSee Letter from Michael T. Schmitz, Ass't Comm'r, Office of Regulations and Rulings, United States Customs Service, to Jay P. Urwitz, Hale and Dorr, LLP (Dec. 4, 2002) (explaining that "[t]he [Byrd Amendment] does not address whether distributions may be made to successor companies" and that its "position limits Customs successor regulation" by "balanc[ing] the expressed remedial purpose of the statute ... with the express language of the [Byrd Amendment] disqualifying even a company acquired by a company related to a company that opposed an investigation."); see also Brief of Customs at 24 ("[T]his is a case where customs is interpreting its own regulation.").
 
 
 [2]
 I suspect that theChenery difficulties associated with the action the Court takes today played a role in the government's tactical decision to defend Customs' stated reasoning on appeal rather than attempting to substitute a new legal theory for the administrative decision.